United States District
Court of Fort Worth

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED

APR - 1 2021

CLERK, U.S. DISTRICT COURT
By 1:51 pm
Deputy

Leslie Garrison,
        Plaintiff

        V.

Warden Carr,                    4-21 CV 0488-P
        Defendant
B.O.P,   Defendant


Motion Under 42 U.S.C
§1983 and Bivens Claims

Comes Now,                                    , know herein as
the Plaintiff in ProSe, nescessary seeking relief Unde
Violation trusted upon her by the Defendants Her
Eighth Amendment along with her Fourteeth
Amendment rights have been maliciously, humiliatingl
and Deliberately violated and contiue to violate by the
Defendants.
    The Eigth Amendment, which forbids "cruel and
unusual punishments" governs the treatment of
convicted prisoners. The Plaintiff will SHOW an object
ive componers and the subjective components to SHOI
the evidence of the seriouness and state of minds
that the Defendant possessed and still till this

date possess

Oh April the 4th of 2020 housing unit 2 North at FMC Carswell was placed on a total lockdown

About Eight minutes after being screamed at and herded into our cells, while being called "Bitches," "Retards" and more, it was told to 2 North housing unit that we were quarentined due to several inmates in our housing unit running high fevers. Testing was not done to comfirm them to be COVID-19 positive though and they were left inside the Plaintiff's 2 North housing unit with 290 other ladies that live together

The Plaintiff fear of death was and is very profound. Ms. Lux came into 2 North and stood halfway up a stairway and notified the unit that "The media is lying and their information is fake about COVID-19 and the young pregnant lady who lost her life to COVID-19".

The total disregard for this young mother and unborn child was heartbreaking and caused 2 North the Plaintiff included to emotionaly breakdown and realize that COVID-19 made it into FMC Carswel' and the Warden and higher ranking staff members were actively keeping it "hushhush". If the media had not reported on the tramic death then the true facts of danger would have continued to be hidden from the Plaintiff.

On April the 9th of 2020 a unnamed officer speaking to several inmates stated, "Two of FM



Carswells own officers had passed away from COVID-19"

When asked, "How come everyone is not being tested including the staff, since the staff member leave and come in and out of different areas not wearing any protective gear or mask?"

The answer was simple, "Because you're just inmates"

The feeling that overtook this Plaintiff and many was best discribed like a small kitten or puppy, beat on, spit on, and pushed into a dorner.

While the threat of a raging fire moves towards them and death and fear are all that is left for them to feel.

On April the 9th we are told our qurentine is lifted at 10:00 am, Only for two and half hours later we were put back onto qurentine because Officer Hernandez was tested for COVID-19 here at FMC Carswell because he was working inside the 2 North housing unit with positive inmates.

A unnamed officer (at this time) told the Plaintiff and others including but not limited to: Faith Blake; Tiffany Snodgrass that the warden had made the "request" that "if" an employee was going to get a COVID-19 test to get tested off site so he could continue to work them."

The knowledge that a killer virus had entered the prison was unjustifiably allowed the deathes and unknown longterm effects to over run the ladies at FMC Carswell. The significant measures

that the CDC had made the world aware of such as; washing your hands often, social distancing "6ft" apart, wearing of mask and gloves along with the use of hand sanitizers was Deliberate, Indifferance that our Constitution states can not be tolerated.

The Plaintiff can not self protect any way because the simplest of the CDC guidelines "washing of our hands" seems that it would and should be the easiest of steps to a person (any person) could do to self protect against COVID-19. Inside the Plainstiff 2 North unit that is not the case. Soap is not provided in the restrooms, to wash our hands regurlary. The staff at FMC Carswell etc,. the Warden, Ms Cole-Rowls and counslor Gardner refuse to provide the much needed soap. It has been 16 days without now and when is finaly given the staff orders it to be watered down by at least 50% or the unit ordelys will get a shot for not following direct orders.

When Cole-Rowls and Gardner, stated loydly to the whole unit "I don't give a shit about you all getting soap!!"

When inmates respond, "We are writing you both up!" They laugh

The Warden and staff were sent countless written copouts and emails copouts begging for soap. No one would respond to our cries

With out this killer Pandemic, having soap should never be anything a human has to beg for

Conditions at FMC Carswell have amounted



to the unnecessary and wanton infliction of pain; the following:

Statements of FACTUAL EVENTS

1) On July 1ST, 2020 the 3rd of the lockdown after thies confirmed cases from the Plaintiff's 2North unit at 6:04pm Lt. Anthony along with Mr. Bulter charge in to the unit. Lt. Anthony was waving a large shot gun in the air, screaming at all inmates, as was Bulter. There was No fighting by inmates to cause said action, there was simply a line peacefully awaiting to use the ladies room. Per policy they do not pull guns against inmates unless the unit has been lost controll over or more than six inmates are fighting.

Nothing even provable by camara was happening

2) Anthony stated, "Meet the real Me!"

3) "You pick inmates Pee and I shoot You!"

4) "I will shoot one of you before this is over"

5) "Try me, God Please!"

6) "I want someone to step forward and tell me to stop I dare you.... Come on who has balls... no body... nothing but pussys!"

7) "You will never get another hot meal I'll see to it"

8) "I'll run this bitch no one else!"

9) "My word is God's!"

10) "Take those two rooms to the SHU right NOW... awww yeah I love it... some one else want to tell me to STOP?"

11) "You will service on Bag nastys period!"

12) "We go home and eat ha! ha! ha! we eat we take care of our health and our families!"

13) "You want to stand in lines to pee, we will make your life a living hell TRY ME!"

14) (To the cell next to 124) "I will shoot you in your fucking face ~ send her to the SHU!" (That was said to a woman sitting on her top bunk who said, "I only wanted to change my tampon Sir."

15) "I'm coming for all!"

Mr. Butler: July 1st 2020

6:05 pm    1) "YOU ARE BREATHING THAT'S WRONG ENOGH!"

2) "Damn Cows.

3) "And then I'm coming in here and I will take your fucking mattresses and bedding, sleep on cold metal. Its enough that you all suck up my air."

4) "Fucking useless inmates your kind are no matter no one will miss you and the fucking COVID-19 can kill you slowly and the whole time I get to watch the suffering, all is a good day on the job for us."

All our lives are mentaly and health wise under full blown threats and true. FACTUAL Abuse and torment. COVID-19 is a True Threat to all the world and as a inmates inside a cooking pot of infection now the Plaintiff must fearfully hide under a bed or under blankets to try to ensure body safely from the men in charge. at her prison who made it clear their desire to watch and aide in the suffering

of every single inmate.

The Plaintiff spent long tear filled hours curled up into herself from verbal attacks and the hunger and fear that she would never have believed such treatment occures inside our America prison system. Inmates are not all bad people who wish hate or harm upon anyone most are not even violate? but the treatment they are subject to is past what our constitution claims we the people will put up with

The CDC had to update the threats that COVID-19 now TRUELY attacks with highier risks associated with obesity start at much lower body mass index. The CDC had held that only the morbidly obese (BMI-42+) were at Now, the CDC says anyone with a BMI of 30+ is at risk. Under the old standard a 50-year old 6ft tall man would have to weigh 310 lbs to be at risk. Now, the same guy only has to tip the scales at 225lbs to exceed a BMI of 30.

Other conditions CDC identifed as elevating COVID-19 risk included chronic kidney disease, COPD, weaker immune systems due to organ transplant, heart conditions, sickle cell, type 1 and 2 diabetes, asthma dementia, cerebrovas- cular diseases, dystic fibrosis, pregnacy and an inherited blood disorder known as thalasemia

Wilson V. Seiter, 501 US. at 297

In respect to living conditions, prisoners must demonstrate "unquestions and serious deprivation of basic human needs" or of the

"minimal civilized measure of life's necessities" when establish an Eigth Amendment violation.

See Roodes V. Chapman, 452 U.S. at 347; accord Wilson V. Seiter, 501 U.S at 308. In Wilson V. Seiter, 501 U.S at 304. "Shelter" includes various aspects of physical conditions including lighting, ventilation and structural deterioration.

Unit 2 North's toilets are out of working order and one has had a trashbag over it and leaks water, leaving standing water, this has been the case for over a year and half. The stall doors are held closed with yarn, while the mold filled showers are held closed by using tampon applicators! If the shower door opens as we shower, we are threatened with a PREA shot, that fdloows that inmate their whole sentence and lists them as a "sex offender." This then remove your email rights, which is how they contact their families. Not to mention the threats of beatings and more when another inmate finds out they are a "sex offender"

Lt. Anthony was screaming "You want Shot?" "Get your fucking aesses to your cells!" "Who wants some?" (While pointing, waving and standing in a highly aggressive threating way).

When women were rushing to their cells some shaking and cring out of shock and fear other ladies were trying to explain "We were only trying to go to the restroom sir."



Anthony screamed, "Try me Please... go to the restroom I am going to finally get to shoot one of your asses And trust me I have been waiting." Lt. Butler was laughing and saying, "shit it's bad enough that you are breathing."

Lt. Anthony charged into cell 125-126 (off the view of the camaras) got into the girls faces and was pounding his chest screaming, "Which one of you wants to get shot because one of you are."

The Plaintiff could not hold back the body tremors and tears that rushed down her face. The emotional pain and fear had the Plaintiff afraid someone, even possibly her, was going to die

See Parrish V. Johnson, 800 F. 2d 600, 604 (6th cir. 1986) (holding that an officer's waving of a knife in a parapalegi prisoner's face knife-point, extortion of potato chips and cookies, incessant taunting, and failure to relay requests for medical care to the nurses violated the Eighth Amendment

Looking to Helling V. McKinney 509 US 25, 33, 113 US. Ct 2475 (1993) ("a remedy for unsafe conditions need not await a tragic event"). Helling concerned exposure to tobacco smoke; other examples cited by the court included exposure to the risk of infectious disease; unsafe drinking water exposed wiring deficient firefighting measures, and assault. Id, 509 US. at 33-34; see also Hill V. Marshall, 962 F. 2d 1209, 1213-14 (6th cir, 1992) (risk of developing tuberculosis); Powell V. Lennon, 914 F. 2d 1459, 1463 (11th cir. 1990) (exposure to asbestos);

Johnson-El V. Schoemeh, 878 F.2d 1043,1045-55 (8th cir.1989)(pesticides); Clark V. Morgan, 710 F.2d, 4, 9-11(1st cir 1983)(dancer-causing chemical).

COVID-19 is like nothing our nation has ever seen before The tragic deaths, the earth shaking fear the unknown future risks it may have. Now the Plaintiff suffers not only the much highier risks of COVID-19 becuase she is housed inside a "tinder box" but the Plaintiff is forced to live "severe discomfort" This is total Deliberated Indifference by these BOP staff members. Being held in especially degrading or abusive conditions. Even if the Plaintiff were exposed for short periods of time to this cruel and unusual treatment it would be held unconstitutional

See, e.g. Hope V. Pelzer, 536 U.S. 730,738,122 S.Ct. 2508 (2002)(holding "hitching post" restraints for seven hours violated Eighth Amendment., ; Surprenant V. Rivas, 424 F.3d 5, 19-20 (1st cir, 2005)(holding three weeks in segregation under, unsanitary conditions would violate detainees due process rights. Which were held equal to Eighth Amendment protections); Despain V. Upboff, 264 F.3d 965, 974 (10cir. 2001)(holding 36 hours subjection to unsanitary flooding and exposure to human waste stated a claim "exposure to human waste carries particular weight" Gaston V. Couglin. 249 F.3d 156, 166 (2d cir, 2001) [plaintiff's allegation that for several days the area in front of his cell was filled with feces urine and sewage water stated on Eight Amendment claim)" McBride V Deer 240 F.3d 1287 1291-92 (10th cir. 2001) (three days in feces-covered cell without cleaning materials stated a

constitutional claim); Johnson V. Lewis 217 F.3d 726,735 (9th cir 2000) (holding that evidence that prisoner's were held in the yard for 4 days in the summer and 17 hours in the winter, without toilet access, without drinking water for several hours without warm clothing during subfreezing weather supported an Eighth Amendment claim).

If the court allows the Plaintiff to skip ahead alittle but will return to the time period that was being discussed shortly, the FACTS are supported by these case also and the Plaintiff does not wish to repeat herself, wasting the courts and hers time.

In Feb 2021, Texas experienced the harshest winter in a hundred years. It did not simply surprize Texas over night...the news covered the coming severe storm for over a week. Making sure Texas citizens could plan and prepare to keep themselves and love ones safe. A FMC Carswell the Warden nor Staff made any precaustionary mesures to ensure the Plaintiff's along with the other 1,100 female inmates safe. A basic human need was HEAT, The temps dropped under -2°

Snow and ice covered the roads causing a hundred car pile up. The heating system did not work before this freezing storm. That was a known Fact by this Warden and his staff. The failure to ensure the woman's safety is Deliberate Indifference to their need.

The women lived in zero wormth. Unable to self protect from these brutal conditions. Plainly



this is a disproportionate extreme conduct forced on to the Plaintiff and other ladies. The serious psychological plain, misery, fear and the purposefully dehumanizing actions by this FMC Defendants and the total disregard to the living conditions must be considered a Eighth Amendment, Violation, our Constitution demands that.

See Scher. V. Engelke, 943 F.2d 921, 924 (8th cir. 1981) ("The scope of eighth Amendment protection is broader than the mere infliction of physical pain"; evidence of fear, mental anguish and misery "can estar blish the requisite injury for an Eighth Amendment claim); Kingsley V. Bureau of Prison, 937 F.2d 26, 32, (2nd cir 1991); White V. Napoleon, 897 F.2d 103, 111 (3rd cir. 1986) Davenport V. DeRobertis, 653 F.Supp. 649, 656-58, 663-64 (N.D. III 1987) aff'd in pertinent part 844 F.2d. 1310 (7th cir 1988); Mitchell V. Newryder, 245 F.Supp. 2d 200, 204 (D.Me. 2003) (holding prisoner denied access to toilet stated avai.'d claim that he was "purposefully subjected to de-humanizing prison conditions" regardless of any risk of harm); Coleman V. Vasquez, 142 F.Supp.2d 226, 236 (D.Conn, 2001) (cumulative emotional pain to a female sexual assault victim from Pat frisiang by male staff may be sufficient injury to support on Eighth Amendment claim); see also Hope V. Pelzer, 536 U.S. 730, 738, 745 122 S.ct. 2508 (2002) (citing "risk of particular discomfort and humiliation from lack of bath-room breaks in addition to pain and risk of

injury, from "hitching post" restraints stating prisoner was treated in a way "antithetical to human dignity"). See Startelegram.com for news reports by: Kailey Johnson Feb. 19th and before on FMC Carswell.

The Plaintiff was without heat for six days during the worst storm in a hundred years. Unil Faith Blake and Shelly Mixson called Kailey Johnson and reported no water for two days (FMC Carswell did not bother to provide any drinking water during this two days). No toilets could be flushed and 290 ladies are housed with Plaintiff in 2 North housing unit so the feces and urine ran over on to the floors and the smells the Plaintiff was subjected to are still lodged deep into her nose and brain. The Plaintiff was forced to walk in the below temps to get her sack dinner and lunch to then return to freezing temps in the unit.

FMC gave "two" bottles of water on Saturday Feb. 19th 2021 After Kailey's news report ran, not because it was right thing to do, but simply as a way to claim "bottled water" was given out. With Texas saying "boil your water." How can the Plaintiff? How can the Plaintiff self-care of self-protect with two bottles of water a day.

The heat came on Magically the day after the news report was ran.

Now, back to claims that we were covering before. We MUST ask ourselves these questions.

A) Would we feel okay and tolerate ourselves or any of our friends or loved ones to be forceably

moved into a known comfirmed Positive room of people and say that is the standard in which we condone?

    - If the answer is yes, then dismiss these claims and take your mask off and DO NOT practice any of the CDC guidelines.

    - If the answer is No, then you need go no further and MUST Grant this §1983 Claim.

    FMC Carswell Factualy moved negitive inmates and positive inmates from housing unit after housing unit. From straight off the bus into housing unit 2 North into cells with "recovered" people (no 14day quarentine) As of Jan 10th 2021 an ongoing right now as of Feburary 19th 2021. Inmates who never tested positive for the COVID-19 virus. were forceably moved into housing unit 1 South and the FMC Carswell moved known positive COVID-19 inmates into 1 South. The Warden then said he was "sorry" for the mixing up, but noone would return to their housing unit until they each tested POSITIVE!

    Noone can know the effects COVID-19 will have on a Person and to FORCE women to catch COVID-19 is in no question "cruel and unusual".

    COVID-19 is a killer and every human being deserves the right to protect their health and life

    Forcing a person to get a unknown killing virus is a possible sentence to death. How would a person recover from the infliction? How would their family?

    FMC Carswell may be listed as the "medical facility" and the fact that they are in no way lifts the burden or

excues the violations to the Plaintiffs Eighth Amendment rights. If anything at all FMC Carswell should be held to a high standard of care and responsibility then other prisons, in saying that the Plaintiff can not find one justification for the clear and plain Deliberate Indifference so callously practiced at FMC Carswell.

In Eighth Amendment cases, courts inquire whether conditions, "alone or in combination, ...deprive inmates of the minimal civilized measure of lifes necessities." Rhodes V. Chapman, 452 U.S. at 347 (emphasis supplied); accord Surprenant V. Rivas, 424 F.3d 5, 19-20 (1st Cir. 2005) (holding jury could find round-the-clock lock-in denial of hygienic products, limited access to water and multiple daily strip searches unconstitutional taken together, even if case law was "in some disarray" about those conditions individually).

Under this "totality of the circumstances" approach Rhodes V. Chapman, 452 U.S. at 363 (Brennan J., concurring merely undecent conditions do not automatically become unconstitutional when you add them together. Rather conditions must have "a mutually enforcing effect that produces the deprivation of a single indentiflable human need" in order to become unconstitutional in combination. Wilson V. Seiter, 501 U.S. 294 304 111 S.Ct. 2321 (1991); see Mitchell V Maynard, 80 F3d 1434 1442 (10th Cir. 1996) (holding placement in a concrete cell with no heat, deprivation of clothing, mattress blankets or any other bedding, prescription eyeglasses out-of cell exercise, utensils, adequate ventilation or hot water

and allowance only of minimal amounts of toilet paper, in combination, were a "significant departure from the healthy habilitative enviroment the state is required to provide its inmates") (citation omitted); Ruiz V. Johnson 37 F. Supp. 2d 855, 929 (S.D. Tex. 1999) ("the combination of inmates who are routinely subject to violence, extortion, and rope, of officers who are aware of inmate-on-inmate victimization but fail to respond to the victims, of high barriers preventing inmates from seeking safekeeping or protective custody, and of a system that fails accurately to report, among other data, instances of requests for safe keeping and sexual assaults, and as well, the deviousness of the risk to prison conditions cruel and unusual by denying inmates safety from their fellow inmates"); Carty V. Farrelly 957 F. Supp 727 735-36 (D.V.I 1997) (finding shelter provided by jail constitutionally inadequate based on consideration of multiple factors).

The Plaintiff finds that failure to provide safety from fellow inmates and very interesting statement of case law. Seeing that FMC Carswell not only refused to safe keep the Plaintiff and other inmates along with its own prison staff while the overwhelmingly obvious risk of COVID-19 was storming through the world and at a five times highier rate inside the priso that cruely and purposely mixing positive and negatives, refusing 2 North hand soap for 16 days and again for 11 days, No proper mask, No sanitiz nor offered on commissary, No gloves, No

social distancing. No cleaners, rotten food, and No hot meals for over 20 days, with the added mental pysical, emotional abuse by these Defendants has to meet the standards of failure by FMC Carswell and each defendant name herein.

While Lt. Anthony and Lt. Butler threatened brandished large firearms and more, the Plaintiff watched helplessly while ladies stood in their door ways with blood running down their legs, because the tampons could not hold back the blood as long as we were forced to go without the restroom, all these ladies and the Plaintiff were doing was waiting in a line to get to the restroom.

A women could not suffer any more of a degrading or abusive conditions that are unconstitutional even if imposed for short periods of time.

All other housing units of FMC Carswell were provided soap, toilted paper, cleaning supplies and only one other unit suffer Lt. Anthoney and Butler's abuse. The Warden was made known of the abuses and in person when the Warden was asked, "Why does Lt. Anthony not have to wear a mask inside the prison and while standing next to you and myself?"

Lt Anthoney leaned in almost nose to nose with inmate Tiffany Snodgrass and said "Because I dont have too!"

The Warden the looked at Snodgrass and stated with a smile on his face, "Does that answer your question?" Snodgrass replied, "No it does not, but

do I have a choice?"

And the Warden said, "Good, glad you're clear now." FMC Carswell had 14,000 medical grade mask for all inmates and a single inmate was orderd to pack all of them up by her boss, by orders of the Warden and Warden knowingly get rid of the proper mask to replace them with hand made by UNICOR. Masks made with the same fabric used to make the mens boxers. That inmate is Bishop, also sueing.

Deliberate indifference in Eighth Amendment cases falls somewhere between mere negligence (carelessness) and actual malice (intent to cause harm) Farmer V. Brennan, 511 U.S at 835-36; Wilson V. Seiter, 501 US at 297-304

Gross negligence is a "nebulous" term that generally means" something similar to the civial law recklessness standard. Farmer, 511 US. at 836 n.4; see also Canton V. Harris, 489 U.S. 378, 388 n.7 109 S. Ct. 1197 (1989) (suggesting that gross negligence is not the same as deliberate indifference.

And the Plaintiff does not wish the court to think that she would ever agree that these defendants were merely negligent. The Supreme Court has held that a prison official can be found reckless or deliberately indifferent if "the official knows of and disregards Farmer, 511 U.S. at 837.

Warden Carr and Staff members named as defendants and unnamed Staff members can never claim that COVID-19 just snuck up on them overnight and they had less then a few hours to prepare for this

killer virus and storm of historical measures.

The media covered almost nothing but COVID-19 news. The BOP released all of their statements of how much "Extraordinary" care they were taking to keep inmates safe. Warden Carr repeats those statement yet in the denials for every single inmate at Carswell, Warden Carr states, that there are no Extraordinay or Compelling reasons to grant the Compassionate. So, this Plaintiff ask the Court and the public - "If he is practicing and taking "Extraordinary" steps to protect and care for us... "Why, if there are no Extraordinary or Compelling reasons" for a compassionate person. A person can not have it both ways and both be true.

The fact that a condition or a risk was obvious is circumstantial evedence that will permit a judge or jury to conclude that a defendant evidence about what the defendant knew. Farmer V. Brennan, 511 U.S at 842-43; id at 837 (the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and he must also draw the indifference"); See Hope V. Pelzer, 536 US 730 738, 122 S Ct 2508 (2002); Vinning-El V. Long, 482 F 3d 923, 924-25 (7th cir. 2007) (holding jury could infer that guards working in the area knew about grossly filthy cell conditions), Estate of Carter V. City of Detroit, 408 F3d 305, 312-13 (6th cir 2005) (holding a jury could infer actual knowledge of a risk from a defendants knowledge of a prisoner's condition, and could discount the defendant's claim he did not belive she was at risk); Lolli V. County

of Orange, 351 F.3d 410, 420-21 (9th cir. 2003) (holding off-icers indiffrence to a diabetic prisoner's extreme be-havior sickly appearance. and explict statement about his condition could support a finding of actual know-ledge of a serious risk); Wilson V Seiter, 501 U.S. 294, 300, 111 S.ct. 2321 (1991) ("the long duration of a cruel Prison condition may make it easier to establish knowledge") (emphasis in original).

For these defendant's to claim they had no know-ledge of the coming of the dangerous, possibly life threatening COVID-19 and then to go on to claim to knowledge of the history making winter storm would only be justified if each defendant was locked away in a dark room, in a coma. There's not a news channel or paper internet posting, last but not least the defendant's own heads at BOP and DOJ, made it clear what was coming, and these defe-ndants simple could not be bothered.

The Plaintiff witnessed many ladies crying out for help for their fevers, pain, lungs and the medi-cal staff would state "You're fine its allergys" or We are not going to give you anything, get it off commissary" and would lie and place temps on the form that was wrong therefore no questions ever accorded.

Commissary was stripped from Prisioner's not allowing the women to purchase fever relief, water food, soap, shampoo or any hygine.

Commissary shut down was because the FMC Carswell staff did not wish to work to bring it over to

any unit. The Warden agreed with them and allowed the Plaintiff and others to suffer the basic elements of hygine were striped from the Plaintiff by the defendant's not providing and then by the defendants blocking the buying to attempt to self-care and protect.

Tampons and pads were not provided and cole-Rowls and LUX said "40 use socks, because they did not care."

Before the honorable court asks... "Yes the Warden was emailed by many in 2North and no replys have ever been given. Then the Warden removed his link for us to be able to email him personaly.

(B). Shelter

A prisoner must be provided with "Shelter which does not cause his degeneration or threaten his mental and physical well being. Ramos V-Lemm 639 F 2d 559, 568 (10th cir. 1980).

(1) Crowding

One important aspect of shelter is whether it is adequate to the number of people confined in it. The Plaintiff is in a two-person cell that is that has-four inmates in it. She can sit on her cellmates hands. The six feet social distancing to help a person protect their lives can not be practiced.

This Pandemic has brought to light the deplorable deliberate Indifference and the complete

break down in medicalcare, Foodservice, deteriorated phy-sical conditions, complete lack of mental care and not only a lack of mental care but the humor and insulting attempts. at them claiming they came through 2Norths unit. <u>Harris V. Angelina County, Texas</u> 952 F.2d 820, 824-25 (4th Cir. 1992)("over-crowding accompained by unsanitary and dangerous conditions can constitute on Eighth Amendment violation"); <u>Wellman V. Faulkner</u>, 715 F.2d 269, 274 (7th Cir, 1983) (pro-blems with physical plant sanitation, food services, and recreation!)

It has been over a year that this pandemic has been chaging our world and the way in which we care for ourselves and others

These conditions have been ongoing before this new threat, but no inmate was ever brave enough to stand up and let the courts and World know what's truely going on inside FMC Carswell, until the Plaintiff and others had to be in fear of death and watched fellow inmates beg for help and recieve none, only to die.

Lt Butler screamed "I will come in this Fucking unit and take your blankets and mattersses and laugh while you sleep on just the cold metal bunks.

While I am here I am taking every bit of commis-sary you may have so that you can complain some more about eating "bag nasties"! let's see how long you last then"...

The Plaintiff understood Lt. Butler's threats were very true so did the other staff standing with him While he threatened each of us, Lt. Butler

is the Lt. over the SHU and it is his practice to strip ladies of their mats and blankets and to issue no more then 3 pads a week if they are bleeding. The temps are kept so cold there that your body hurts and you just need warmth. This is condoned by the Warden and the defendants listed in this lawsuit, as they each walk through the SHU housing unit and do nothing to help, instead they laugh or say, "Dont come to the SHU if you dont like it here."

Lt. Anthony and counselor Gardner, nurse and more were all standing with Lt. Butler while he screamed his threat. Noone came to our aide. Thompson V. City of Los Angeles, 885 F2d 1439, 1448 (9th cir 1989); Anela V. Wildwood, 790 F2d 1063, 1069 (3rd cir 1986)(holding over-night detention without beds or mattress, appeared to deny due process); Oladipupo V. Austin 104 F. Supp 2d 626, 639 (W.D. La. 2000) ("a mattress is a basic human need, which MUST be provided to a detainee"). But see Stone-El V. Sheahan, 914 F. Supp. 202, 206 (N.D. Ill 1995).

(2) Ventilation and Heating

Ventilation is a fundamental attribute of "shelter" and sanitation; both of which are basic Eighth Amendment concerns. Minifield V. Butikofer, 298. F. Supp. 2d 900, 904 (N.D. Cal. 2004). Many courts have held that inadequate ventilation violates the Eighth Amendment of contributes to an unconstitutional combination of conditions. Benjamin V. Fraser, 343 F.3d 35, 52 (2nd cir. 2003)(evidence of large numbers of inoperable windows, clogged or dirty ven-

tilation registers and exhaust vents in showers and cells, and poor air quality", plus finding concerning threatened and actual health hazards, supported finding of constitutionally inadequate ventilation); Board V. Farmham, 394 F 3d 469, 486 (7th cir. 2005) (holding evidence that ventilation system was contaminated with fiber glass dust and mold supported on Eighth Amendment claim); Keenan V. Hall, 83 F. 3d 1083, 1090 (9th cir 1996) (holding allegations that the air was saturated with the fumes of feces, urine, and vomit supported an Eighth Amendment ventilation claim), amended on other grounds, 135 F3d 1318 (9th cir. 1998).

In 2 North housing unit where the Plaintiff lives the ventilation is so packed with hair, dust and insect dropings that the mixture hangs from some of the vents. The CDC acknowledged that COVID-19 virus could travel through the venting system and even that it was so tiny that filters could not stop it so a new filter was made to stop COVID-19's travel through vents.

Hospitals (that are REAL unlike FMC Medical) have the rooms that the infected stay in sealed by clear plastic, that covers every inch to block the virus or at least slow the spread. The Warden came into the units and had cheap plastic shower curtains taned up in the cell doorways, after almost the whole unit was sick (but the remaining negitives were forced to stay there still and in cells with tested positive inmates.) This measure was a sad show of the care this Warden and defendants felt for the inmates. These shower curtains did not seal the door ways. Did not go all the way to the floor, they were 2ft

above the floor. The sides flaped and middle was saild, unlike the medical curtains that have a slit down the center that seals up. Ms. Cole-Rowls along with Warden Carr and Lt. Anthony came into 2 North and said, "Well at least maybe these will slow it down some and we understand its too late."

They proceeded to move through the unit and take photographs of the Warden "ajusting shower curtains. None of those photos showed the trueness of the height of 2ft off the ground nor that they were merely cheap shower curtains.

When the winter storm hit Texas and temps were -2° and lower 2 North had No Heat for six days. Freezing and suffering with No Water for two days and No Hot Water for another two was beyond extreme conditions added with the COVID-19.

Inadequate or excessive heat also violates the Ct 2321 (1991) (warmth is a basic human need; low temperatures and no blankets would violate the Eighth Amendment); Benjamin V. Fraser, 343 F. 3d at 52 (affirming finding of unconstitutionality based on evidence of extreme temperatures, including no heat at times during winter); Dixon V. Godinez 114 F 3d 640, 642-45 (7th cir. 1997) (..."[P]risoners' have a right to protection from extreme cold"; cold alone may violate the Eighth Amendment;

"Severe discomfort" can be unconstitutional without imminently threatening health.

On top of watering down the soap so the clean-



ing power is less. They will leave 2North without any soap for 10 to 12 days with ease. No commissary and what do the courts and public and CDC say a women should do? Signs were rushed to be taped up the morning Regional was walking through that addressed how and the importance of hand washing often, also signs for sleeping head to foot. Which they removed swiftly after walk through or photographs were taken to show they posted the proper information

Prisons are required to provide for clean clothing and bedding, and to make available toilet articles such as soap, toothbrush and toothpaste, sanitary napkins, and toilet paper. Board V. Farnham, 394 F. 3d. 469, 481-82 (7th cir 2005) ("the right to toothpaste as an essential hygine product is analogus to the established right to a nutritionally adequate diet"); Myers V. Hundley, 101 F.3d 542, 514 (8th cir. 1996) ("a long-term repleated deprivation of adequate rights... Prisons may either regulary provide these supplies to inmates free of charge or they may give inmates a suffient allowance with which to buy them."); Penrod V. Zavaras, 94 F.3d.1399, 1406 (10th cir. 1996) (allegation of denial of free toothpaste and razors to indigent prisoner raised a factual issue under the Eighth Amendment Where plaintiff alleged serious harm as a result);

July 7th 2020 supplies were finaly issued after 7 weeks or more without!!!

In Qurantine the ladies got only the fallowing (1) 1 Roll of toilet paper a week per inmate

(2) 1 Bar of soap per inmate

(3) 5 pads or 5 tampons per inmate

(can not have both)

C. Sanitation and Personal Hygiene

"A sanitary enviroment is a basic human need that a penal institutional must provide for all inmates." Carver V. Knox County, Tenn., 753 F.Supp. 1370, 1389 (E.D. Tenn. 1989) ("functioning sinks, toilets and showers are basic necessities of modern life. particularly within the confines of a wholly self contained environment such as jail) remanded for reconsideration 753 F.Supp. 1398 (E.D. Tenn. 1990)

The Plaintiff shows that three out of the seven toilets down stairs in 2 North do not work and one has had a plastic trash bag covering it for over a year and a half. So when COVID-19 started and to present. Three sinks out of six do not function the side panel has fallen off. Standing water from the trash bag toilet causes smells and grim. Sinks leaking and causing standing pools of water that the Plaintiff has fallen from.

FMC Carswell states they provide each housing unit with proper cleaning products. This inside 2 North could not get any further from the truth.

Ladies were moved from 2 south. The 2 South inmates into 2 North and 53, 2 North ladies moved to 2 south. The 2 South inmates were and are in shock at the realness of the rumors with in

officers and inmates that 2North only get 3 rolls of toilet paper a week if you're on your period or sick, as most are there will NOT be any more given, period. No other unit practies this. Soap is watered down (ordered by Gardner and Cole-Rowls and known by Lts and Warden the Plaintiff and many others have spoken to the Warden in regards to this. The answer given, "Thats 2North team problem." That comes from the heads off this ship. So what hope does an inmate have to be treated human? None!

Sanitation and Personal Hygiene covered by our Constitution under the Eighth Amendment for good reasons, becuase humans should not be tortured and forced to suffer.

"A sanitary environment is a basic human need that a penal institution must provide for all inmates. Toussaint V. McCarthy, 597 F.Supp. 1388, 1411 (N.D. Cal. 1984) off'd in part and rev'd in part on other grounds, 801 F. 2d 1080 (9th cir 1986); accord Towsend V. Fuchs, 522 F.3d 765 was actionable under Eighth Amendment); VinningEl V. Long, 482 F.3d. 923, 924 (7th cir. 2007) (holding confinement in fithy cell without bedding, toilet paper or working plumbing denied "minimal civilized measure of lifes necessities"); Gates V. Cook, 376 F.3d 323, 338 (5th cir, 2004); Carty V. Farrelly, 957 F. Supp 727, 736 (D.V. I 1997) ("Generally sanitation is one of the most basic humans needs.")

Could the public and Courts agree that ladies

29

being thrown into cells with known COVID-19 possitive cases, being made to eat rotten food to not being given pads or tampons to be refused any cleaning supplies for the cell or their own bodies be the basic way to treat someone?

The Eighth Amendment requires adequate arrangements for cleaning and garbage disposal Gates V. Cook 376 F3d. at 338 (affirming injunction to clean cells between occupants and make cleaning supplies avaiable weekly); Hoptowit V. Spellman, 753 F2d 779, 784 (9th cir. 1985) (failure to provide adequate cleaning supplies); Ramos V. Lamm, 639 F2d. 559-70 (10th cir. 1980)(citing "lack of ~~routing~~ routine maintenance and cleaning pro-grams" and inadequate cleaning supplies for inmates to clean their own cells in finding constitutional violation); Marion County Jail Inmates V. Anderson, 270 F.Supp 2d 1034, 1039, 1041 (S.D.Ind. 2003)(citing "unhealthy, unsanitary, dangerous, offensive conditions."

How much highier has the need for these protection to be taken seriously would it seem during a "Pandemic" Vs. Everyday Life?

The women in the lawsuit are only the names the public and courts will hear about. That does NOT mean we are the only ladies to suffer at these defendants hands with the support of their Bosses "The BOP." The Warden and staff members named inside this here lawsuit knew that the care and safety fully expect for the Courts and public to the Plaintiff's are nothing but mere "inmates". There by, saying "they

are dirty, trash, unworty of any rights.

It cannot be allowed to go on anylonger. The FMC Carswell's named staff Warden Carr and The BOP are guilty of murder and attempted murder period!

At FMC Carswell the kitchen has vermin and large flying roaches. The staff state, "Well it's not a 5 star resturant its fuckin prison if you dont like it Dont Come or Leave!."

Rats eating inside the coolers in the bread bags that all inmates bread is served. Rat poop, pee and spit are left behind and we are still forced to serve it! Faith Blake was the "Staff Dining Cook" and had entered inside a cooler to get a bag of cheese and flour torts and there looking at her through the plastic bag was a rat. Blake was told to leave it for the inmates cooks and get another for "Staff dining."

Infestation by vermin, may also violating the Eighth Amendment; Gaston V. Coughlin, 249 F. 3d 156, 166 (2nd cir. 2001) (holding allegations of rodent infestation supported on Eighth Amendment claim).

Inside Housing unit 2North the sinks are always broken, one of seven toilets has been covered by trash bags for over 1'1/2 years. One North Unit over flowed with all the nasties ones mind can picture. Women go without hot water for days at time and during the history making winter of 2021 the ladies had no heat for 6 days temps outside were deadly at -2°. We went with no water period for two days and no hot water for four.

The freeze was history breaking and the media



covered it's coming for nearly two weeks before Texas was overtaken by the ice and snow. FMC's Warden did not have any concern to fix the heat knowing it was out of order. Deliberatly and Melicious ly not provide the health and safty to the "Hospital" Federal prison. Did they think to provide extra blankets and water for drinking? The answers "NO" not until the sixth day when Faith Blake called Star telegram's Kailey Johnson shaking from the freezing temps to tell Ms. Johnson what they were going through and Ms. Johnson running the story right there gave the ONLY cause that could make the FMC Carswell hand out an extra blanket, two bottles of water (once a day) for two days. The public's eyes matter in the world of private torture. The efforts were to late but proved that even Warden Carr and Staff know that what they push the women through at FMC Carswell is wrong, humiliating and antihetical to human dignity. The BOP makes the st claims in all of their press releases policies statements that they practice Extraordinary Measures to ensure the health and safety of the inmates under their care.

Then how have so many, 1983 Bevins Constitutional violation lawsuits been won by inmates?

The BOP is a large government business with large government Bullies, but once in a while a few are suffering.

The women are the most beat down class of inmates because most of them are already victims of abuse and very easy to abuse further



by the Biggest Bullies of all.

Who do the women reach out to inorder to be sa-ved protected remembered? Our public and our county courts! Out of fear from being told "No one cares anymore" "Ok, inmate try and I'll make your life inside prison even harder" "We are the law!" So many do no speak out The World's in a Pandemic thats a killer of anyone it chooses and just laying down and suffering dying, watching other BEG for help has to STOP NOW!

## Conclusion

The brave group of fellow ladies that came before Honorable Judge Mark Pittman seeking a class action lawsuit were ruled that Faith Blake could not represent the other 72 inmates and Ms. Blake understood. Honorable Judge Pittman gave each lady her own case number and added the lawsuit Ms. Blake had written on to each of theirs. In all honesty and after tons of threats by FMC Carswell's staff many backed away out of fear.

I was being moved all around to ensure I would become COVID-19 positive that I could not get to anyone to help a new I come before your Honorable Court with a lawsuit against The BOP FMC Carswell Warden Carr, Lt Anthony, Lt Butler, Ms Lux, Ms. Cole-Rolws. No person should ever be forced to live in such abuse and malice. I can't breathe.



The mental suffering will along with the COVID-19 side effects stay with me forever and The BOP Warden Carr made sure that it would happen to us. Remembering his statement, "You are not coming out of this positive unit until you test positive period. It helps us get it all over with handling it this way."

Why not just End that with a "Good Luck" because no one can foresee how their body will handle the COVID-19. Mentally I am crushed My Country is not a country that does such acts... Right?

Done This ____ Day of March

Certificate of Service

I, the undersigned, do hereby certify that I have served a copy of this motion upon the clerk of this court, via U.S. Mail, properly addressed, First-Class postage prepaid, placing into the internal mailing system as made available to inmates for legal mail at the FMC Carswell Federal Correctional Institution. The Movant/Defendant further requests that a copy of this [Her] pleading be forwarded to all interested parties via the CM/ECF System, as she is detained, indigent, and has no other means.

Done this _____ Day of _____, 2021.

X _____

Facts; Cause of Actions

L. Ed. Digest: Civil Rights § 22

42 U.S.C.S. § 1983, which provides in part: "Every person who, under color of any statue, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress ..." (Thomas, J... joined by Roberts, Ch.. J., and Scalia, Kennedy, and Alito, JJ.)
Deprivation of Rights - liability

Because we are in prison does NOT justify abuse, mental abuse deliberate indifferences, by failure to train, deliberate indifferences by medical care, testing, and all concern toward inmates 8th Amendment Rights. These protections are CLEARLY here in place. not only due to protect the human inmate, But are there because these types of cruelty and unusual punishments have IN FACT recorded and can not be brushed under the rug because the BOP and its staff members feel they are untouchable. Power is allowing abuse.

Local government - employees' actions -
vicarious liability

L. Ed Digest: Civil Rights § 27

A municipality or other local government may be liable under 42 U.S.C.S. § 1983 if the governmental body itself subjects a person to a deprivation of rights or causes a person to be subjected to such deprivation. But, under § 1983, local government's are responsible only for their own illegal actions.

They are not vicariously liable under § 1983 for their employees' actions.

(Thomas, J. joined by Roberts, Ch.J. and Scalia, Kennedy, and Alito, JJ.)

Question here is "what if the municipality or/and local government had knowledge of the abuses and illegal acts?

In the case of FMC-Carswell they were notified by media, families and suffering women...

When is power, title, money going to stop being the shield?

This Plaintiff seeks a answer to this question, not only for herself but for each female, male prisoner whose life has ended or attempted end or abuse by these municipalities and local governments!

Plaintiff ask this court, "will you protect my abuse?"

Plaintiff moves to include the Bureau of Prisons (BOP) as a Defendant to her 42 U.S.C.S. § 1983 action.

Municipal Liability — official policy — failure to train

L. Ed. Digest: civil Rights § 27

Plaintiffs who seeks to impose liability on local governments under 42 U.S.C.S. § 1983 must prove that action pursuant to official municipal policy caused their injury. Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymakers, officials, and practices so persistent and widespread as to practically have the force of law. These are actions for which the municipality is actually responsible. In limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983.

Exhbit "A"

Mask we are given. Never any N95 or Medical grade. Those were ordered but Warden Carr had inmate Bishop pack them all up and had them shipped out. He had these made for us.

You can see the low grade it is

"That's because he and The BOP are indifferent to our lives."

Exhibit "B"

News article on FMC

Carswell

# U.S. House probes outbreak at detention facility

*Exhibit*

## CDC to aid with testing at migrant center with many cases and 1 death

BY ANTONIO OLIVO

The House Committee on Homeland Security on Friday asked for records related to a widespread outbreak of the novel coronavirus inside a Virginia immigration detention center after a 72-year-old detainee there died while hospitalized with the disease earlier this week.

Also on Friday, Virginia Gov. Ralph Northam's office said the nation's top public health agency has agreed to conduct widespread coronavirus testing at the facility located in Farmville.

The facility has experienced the nation's largest coronavirus outbreak inside a detention center, with 259 detainees — most of the population — being monitored for the disease, according to Immigration and Customs Enforcement.

In a letter to Immigration Centers of America, the company that operates the Farmville facility, Rep. Bennie Thompson (D-Miss.) said his committee is concerned about how the outbreak has been handled since the first coronavirus infection was recorded there in late April.

"Farmville detainees report that they have been pepper sprayed and fired at with a 'noise-distracting round' in response to their protests on the spread of the coronavirus inside the facility," Thompson wrote. "This is dangerous, as the use of irritants such as pepper spray can induce coughing, increasing a person's chance of catching a respiratory illness such as COVID."

Those allegations also were included in a lawsuit filed in federal court last month. That suit was filed a few days before Northam (D) and both of Virginia's U.S. senators asked President Trump to allow the U.S. Centers for Disease Control and Prevention to get involved.

Thompson's letter requested, among other things, details about the transfer of 74 detainees into the facility in June, people the lawsuit claims were not tested for the coronavirus beforehand.

Immigration Centers of America referred questions from The Washington Post to ICE, which declined to comment on Thompson's letter.

But ICE officials confirmed that James Thomas Hill, a Canadian national held at Farmville since the spring, died Wednesday night, nearly a month after he was hospitalized with covid-19, the disease caused by the coronavirus, in Lynchburg.

ICE officials said the cause of Hill's death is still under investigation, though he had been experiencing shortness of breath when he was hospitalized. The agency said no other Farmville detainees are currently hospitalized.

"ICE is firmly committed to the health and welfare of all those in its custody and is undertaking a comprehensive, agency-wide review of this incident, as it does in all such cases," the agency said in a statement.

The death sparked a fresh wave of outrage among immigrant advocates over how the pandemic has been handled inside the Farmville facility and other immigrant detention centers.

In particular, ICE's willingness to transfer detainees between facilities during the pandemic has allowed the disease to spread, those advocates said.

"That is directly what led to this man's death," said Simon Sandoval-Moshenberg, legal director of the Immigrant Advocacy Program at the Legal Aid Justice Center, which is representing some of the plaintiffs in the federal lawsuit filed in Alexandria's U.S. District Court.

Northam spokeswoman Alena Yarmosky said that the CDC agreed last week to conduct widespread testing at the facility after the governor appealed to Trump for assistance. CDC officials didn't immediately respond to messages on Friday.

"While the state is unable to enter this property without permission from the facility, the Governor has pushed for months to gain access for increased testing and disease management," Yarmosky said. "In fact, the Department of Health has repeatedly attempted to assist with testing but has been denied by this center."

ICE has said it has taken "extensive precautions" to limit the spread of coronavirus among its detainees, including regular testing and adding more handwashing stations inside its facilities.

*antonio.olivo@washpost.com*

*Exhibit 1*

 **INVESTIGATES**

# Inside the federal prison where three out of every four inmates have tested positive for coronavirus

**By Casey Tolan, Nelli Black and Drew Griffin, CNN**
Updated 8:07 AM ET, Sat August 8, 2020

**(CNN)**When James Giannetta first called his brother Russ in late June to tell him that the coronavirus was beginning to spread in his Texas federal prison, Russ could hear the fear in his voice. "This place is exploding," James warned.

Russ soon got another call: James, a 65-year-old inmate with diabetes and HIV, had tested positive for the virus himself. Within days, he was rushed to a hospital as his oxygen levels plummeted. A few weeks later, after his condition deteriorated and he was placed on a ventilator, he was dead.

As coronavirus has spread rapidly through prisons and jails around the country in recent months, the Texas lockup where Giannetta spent his last days has emerged as the hardest-hit federal prison in the United States. More than 1,300 of the roughly 1,750 prisoners at FCI Seagoville prison and camp have tested positive for the virus, according to data from the federal Bureau of Prisons -- a stunning three out of every four inmates. So far, three inmates at the prison, including Giannetta, have died from Covid-19.

Five Seagoville inmates told CNN in phone interviews from behind bars that they feared for their lives as the virus rushed through the Dallas-area prison, and that the crowded conditions made it all but impossible for them to stay socially distanced.

"It came through here so fast that it's out of control," said Bobby Williams, an immunocompromised inmate who has about three years left on a more than two-decade drug sentence. He said he came down with severe pneumonia after contracting Covid-19 in June. "We're packed like sardines."

As the BOP has scrambled to stanch the spread of the virus in its facilities, the toll at Seagoville and elsewhere raises questions about whether the Trump administration is doing enough to release elderly and medically vulnerable prisoners -- even as several high-profile inmates like former Trump campaign manager Paul Manafort, former Trump lawyer Michael Cohen and the rapper Tekashi 6ix9ine have been released from prison to home confinement.

The BOP declined repeated requests for an interview with officials at Seagoville or national officials involved in setting coronavirus policy. A spokesperson said the agency distributed cloth masks to every inmate and guard, began mass testing of inmates in the prison by late June and stepped up sanitation procedures, among other policy changes.

But the low-security men's prison -- which once held Japanese and German detainees during World War II, among others -- is now a cautionary tale for how quickly the coronavirus can take deadly hold in correctional facilities.

Since the beginning of May, when there was only a single coronavirus case at Seagoville, the number of inmates who have tested positive has soared to 1,333, according to BOP data (including prisoners at a minimum-security camp next to the prison). Twenty-eight of the roughly 300 prison employees have also tested positive.

The outbreak means that the facility has more coronavirus cases than about 85% of the counties in the US.

Dr. Homer Venters, the former chief medical officer for New York City's jail system, who has inspected federal prisons' coronavirus response plans, said outbreaks at Seagoville and other prisons were like "popcorn kernels popping off over an extended period of time."

"There are many facilities that either have gone through the same thing or will," he predicted. "This is really a tragic situation that's playing out all over the country."

## Early release programs fall short

Prisoner rights advocates say that the BOP has fallen short on the most effective way to save inmate lives: reducing the number of vulnerable people inside the prisons.

Federal inmates have two paths to early release during the pandemic. The BOP is evaluating inmates for home confinement, which is granted based on factors like inmates' age, risk factors for Covid-19, the seriousness of their offense and their conduct in prison. Manafort and several other high-profile inmates were released under this method, which was expanded under the CARES Act earlier this year.

The agency has released 7,444 inmates to home confinement nationwide over the last four-and-a-half months, according to data released by the agency, out of the more than 157,000 total in the federal system. A spokesperson declined to provide specific numbers for Seagoville or other individual prisons, citing "the fluid nature of the pandemic situation."

Inmates can also apply for compassionate release, a procedure that was streamlined with the passage of the First Step criminal justice reform act in 2018. Inmates with health issues can ask a judge to reduce their sentence; they can also apply to their warden for the federal government to file a court motion for release on their behalf. So far, roughly 900 additional inmates have been released through that track this year, according to Families Against Mandatory Minimums, a criminal justice reform group that has helped recruit attorneys to represent inmates in coronavirus cases.

But criminal justice experts call the releases so far a drop in the bucket compared with the vast numbers of elderly and medically vulnerable people in federal custody. Kevin Ring, the president of FAMM, said federal officials had been arguing in court against many inmates who have petitioned for compassionate release.

"It's been disappointing because most of these people were elderly and sick and now they're the most at risk from this disease," Ring said, arguing that the Trump administration "should have been clearing these people out."

Instead, he said, officials were "slow to react" when the coronavirus started its deadly march through prisons around the country. "We've watched it hop from facility to facility -- when it hits one, it ravages it," Ring said. "It has been terrifying to watch."

Nationally, more than 10,000 federal inmates and 1,300 BOP employees have tested positive for coronavirus, while 111 inmates and one staffer have died.

Several other federal prisons have also faced dramatic outbreaks, although none that infected as many inmates as Seagoville's. In Ohio, a judge ordered officials to release or transfer more than 800 vulnerable inmates at another federal prison ravaged by the virus, saying the conditions in the facility had possibly reached the level of "cruel and unusual punishment." But an appeals court struck down that order in June, finding that the inmates did not prove the BOP was "deliberately indifferent" to the risks presented by Covid-19.

Some Democrats in Congress have pointed to Manafort's release to argue that the administration isn't treating inmates equally. If the coronavirus was "deadly enough of a virus that you needed to protect the former campaign manager, why not all of these Americans who also are vulnerable and have at-risk conditions?" Rep. Sylvia Garcia, D-Texas, asked Attorney General William Barr at a House hearing last week. Barr said he had nothing to do with the decision to send Manafort home but noted that the department had released thousands of inmates.

All five of the Seagoville inmates interviewed said they had been denied compassionate release or home confinement, and some said their families were planning to go to court. In a message denying his request for compassionate release, the prison's warden wrote that "at this time COVID-19 is not considered extraordinary compelling circumstances" under the BOP's compassionate release policy, inmate George Reagan told CNN.

The BOP spokesperson said the agency didn't comment on specific inmates' requests for early release.

For some inmates, the potential of early release came too late. Giannetta, a Massachusetts native who was serving a 14-year sentence for selling methamphetamine and other charges, applied for an early release from the warden and was denied, according to a filing by his court-appointed lawyer. The lawyer submitted an expedited motion for compassionate release on July 3, after he had already tested positive and been sent to a hospital. A judge dismissed the petition as moot after Giannetta died at the hospital on July 16.

Giannetta's older brother Russ, a physics professor at the University of Illinois, said in an interview that he had sent medical documents outlining his brother's myriad health issues to officials at the prison and even wrote a letter to the Centers for Disease Control and Prevention, but his pleas for help didn't seem to have any effect.

The Seagoville facility was a "petri dish," Russ said. He said James knew even before he tested positive that he was in real danger: "He had a pretty good premonition that this was not a place that was going to be able to contain this virus if it broke out."

Prison struggles to respond to outbreak

In interviews, inmates at Seagoville described a chaotic response to the outbreak by prison officials, whose efforts to slow the spread of the virus were hampered by delayed test results and a lack of enforcement of mask-wearing policies.

Bobby Williams, who has skin cancer and takes medicine that reduces his immune response, said he came down with pneumonia after testing positive for the virus. "I thought I was going to die," he said. "I was passing out, I couldn't breathe."

He said doctors at the prison gave him steroid shots and a nasal spray that helped, but over a month later, he still feels the impact from the virus. Williams, 56, has been in federal prison for 22 years and has about three-and-a-half years left to go on drug and money laundering convictions.

Venters, the former New York jail medical officer, has conducted dozens of inspections of coronavirus response efforts in prisons and jails around the country, including BOP facilities. He said that while he hadn't inspected Seagoville, the numbers and stories shared by inmates were troubling.

"What I've found over and over is there is no special protections or special surveillance for high-risk patients," Venters said. In many BOP facilities, he said, "I have observed very large numbers of people in very close quarters, which makes the spread of this virus inevitable once somebody becomes sick."

One difficulty has been the delay in getting test results. Curtis Severns, a Seagoville inmate scheduled to be released next year after an arson conviction based on disputed evidence, said that he and other inmates faced a four-day delay between taking a test and getting the result last month -- which meant that the prison didn't move some positive inmates out of the general population until it was too late.

The BOP spokesperson said Seagoville was using a rapid 15-minute test machine as well as commercial lab tests that have turnaround times of three to 10 days.

Severns, who tested positive and was mostly asymptomatic, said he is now living with five roommates -- all of whom have also tested positive -- in a small former TV room converted to housing.

"I was amazed just how fast (the virus) went, once it started going," he said. "I think everybody here's going to get it."

Mask wearing has been spotty among both guards and inmates, several inmates said, although they added that more people in the prison are now wearing masks regularly in the last week or two as cases have shot up.

Joseph Perrone, who said he is scheduled to go to a halfway house in a few weeks after about a decade in prison for selling cocaine, said he suffered headaches, a loss of

smell and the worst muscle aches of his life after testing positive. "It felt like somebody beat me," he said.

Perrone, 55, who said he worked in the prison's food service at the beginning of the outbreak, said most of the guards overseeing him weren't wearing their masks at the time and "they didn't make us wear ours."

"I was going to work and I'm sure I was infecting people," he said.

Now, as the cases have reached a level that could result in a form of herd immunity in the prison, officials are starting to move operations back to normal, according to a memo to inmates that several described to CNN. Coronavirus-positive inmates who are symptom-free for 10 days will be considered recovered in most cases, and they will start to be moved back to their original housing locations soon, the memo said.

According to BOP statistics, 1,287 inmates at the prison have recovered from Covid-19, while 46 still have active cases.

## Beyond the prison walls

Visitation has been shut down at Seagoville and other federal prisons for months -- but outbreaks behind bars can still spread to local communities as guards and other employees go back and forth to work.

Correctional officers at the facility say they're scared to walk inside the prison's walls, especially because while the agency has tested most of the inmates, it hasn't done the same for the prison's 283 employees. *are their lives more important*

Anthony Simon, a case worker at the prison and a representative for the local union, said he had appealed to the management for broader testing. When he comes home from working at the prison or attending to inmates at a local hospital, Simon said, he strips off his clothes, puts them in a bag and showers before even greeting his wife.

"Everyone's worried they could bring it home to their family," Simon said. "But you're still required to go to work -- we can't leave the inmates by themselves and say we'll come back later."

The BOP spokesperson said the agency couldn't require employees to get tested, but it's providing staff who come in close contact with Covid-19-positive inmates a letter to public health departments that can help them get prioritized for testing.

Research has suggested that prison coronavirus cases can seed broader outbreaks in their local communities. A study of Chicago's Cook County Jail found that inmates going in and out of the jail may be linked with more than 15% of all the virus cases in Illinois as of April.

Still, local officials in Dallas County said they didn't think that Seagoville was having a major impact outside the prison itself. The prison outbreak "has not strained our local health resources as the facility has handled their own response and contact tracing," said Lauren Trimble, the chief of staff for the Dallas County Judge, the county's top executive.

Family members of inmates have organized several protests in front of the prison in recent months. One of the protest organizers, Tabitha Wheeler-Reagan, a Dallas entrepreneur and activist whose husband is a Seagoville inmate, said she thought people in the community weren't paying enough attention to the human suffering in the prison.

Her husband George Reagan, 55, who is scheduled to be released from a more than 5-year drug sentence next year, was sharing a cell with another inmate who got coronavirus in late June, she said. Reagan tested negative twice, so the prison didn't isolate him from the other inmates, Wheeler-Reagan said.

Then, early last month, Reagan called his wife with ominous news: he had lost his sense of taste. She said she immediately called the prison and demanded he get tested again. Once he did, he tested positive.

Wheeler-Reagan said she thinks the prison leadership didn't take the outbreak seriously enough early on and the guards didn't have proper training about how to respond. She was confused why prison officials rejected her husband's bid for home confinement during the pandemic, especially considering he has heart disease and he'll likely be eligible to go to a halfway house later this year, she said.

"I one hundred percent don't think that the federal government cares at all," Wheeler-Reagan said. "This is one of those situations where they can't blame anybody but themselves."

*CNN's Collette Richards contributed to this report.*

Maybe if the world stop only seeing a inmate as a "inmate", we are still real humans with real hearts, feelings, minds, families dreams and worries.
Calling us "Inmates" removes from the worlds thoughts that we are real people not only the title given by where we live! It's so easy to be cruel to us and disreguard it as ... "Their inmates, They deseve what they get. Total removal of humanity promits our Abuse.

Exhibit "C"

The BOP Policy on cell space. We are (4) to a cell that is only 88ft. We should Just Barely meet a Two person cell. There's more Deliburate indifference, crukety...

They wrote their polices yet know even in a pandemic and 6ft. aparts A CDC guideline, We are packed.

*[handwritten across top: "Ch. For Elwood To Understand"]*

## ◼ SUPPLIES

While equipment corporations invest in reinforced furnishing and hardware for facilities to justify higher pricing, those that manufacture supplies distributed to incarcerated people cut corners. These cheap, knockoff consumer products claim to protect facility security but create serious health risks, putting incarcerated people in danger.

For instance, Bob Barker emphasizes both contraband-prevention and cost-efficiency in selling its Maximum Security® & Clear All-in-One Shaving Cream, Soap, and Shampoo, which is merely unscented soap repackaged in a clear bottle. However, the company takes cost cutting a step further by replacing typical soap ingredients with dangerous preservatives not found in free world consumer brands that irritate skin and may even cause birth defects.[30] Unbelievably, the corporation's own safety warning advises people to avoid skin contact with the soap.[31] Yet, at just $0.14 per ounce[32] – compared to $0.32 per ounce for name-brand products like Suave[33] – it remains attractive for correctional agencies. As a result, to protect their health, incarcerated people are forced to purchase their own soap at commissary.

*[pull quote, right]* Bob Barker Company[29]
*"Areas of the body that have or are only even suspected of having come in contact with the product should be rinsed immediately with plenty of running water and possibly soap."*

*[handwritten margin notes: "Wow! Is this OK Because I am Less than a person?"; "I am not worth safe products"; "How when there is NO commissary? How when you are NEVER TOLD the products unsafe do you know the facts the very company says?"]*

## ◼ SECURITY EQUIPMENT

Correctional equipment corporations enable and encourage some of the most brutal practices behind bars. They provide correctional administrators with tools used to force people into obedience, using advertising that either obscures or downplays the harm they inflict. Some corporations go as far as to sell security equipment that resembles medieval torture devices. For example, Humane Restraint—whose name alone makes light of its cruel products— sells leg weights, restraint beds, and wrist shackles with inappropriately kitschy marketing.[35] These restraints can cause severe physical and mental harm.[36] Though federal, state, and local regulations often restrict the use of restraints, corrections officers frequently turn to them to punish minor infractions.[37] In fact, in some facilities, these restraints have become the default response to someone in need of mental health care.[38]

*[pull quote box, right]* ❝ I can count one hand when [a Taser] was used appropriately.

Steve Martin, former general counsel for Texas Department of Criminal Justice[34]

With little regard for those on the receiving end of their equipment, these corporations, including arms manufacturers and suppliers, also deceptively market dangerous weapons as "less lethal," spreading military-grade weaponry across prisons and jails while avoiding liability for the consequences of their use.[39] These weapons include batons, stun guns, rubber bullets, tear gas, and pepper spray.

For instance, stun guns are extremely dangerous, but equipment corporations continue to sell them without consequence. Axon, which sells Taser, previously advertised its products as "non-lethal" and

EXTRA
HEAVY DUTY
LEATHER MUFFS
with attached wristlets

*Humane Restraints, Example from wholesale catalog[42]*

*Safariland, poster instructing corrections officers how to use a baton to inflict pain without causing lasting damage[41]*

"safe" before adopting the term "less lethal" to avoid lawsuits by people who suffered cardiac arrest after being struck with their products.[43] Axon even warns that a stun gun is more likely to kill someone if they have a mental illness, history of drug use, or heart disease,[44] conditions that are disproportionately common among incarcerated people due to failures in social support. Still, correctional agencies purchase and use Tasers in large quantities, knowingly endangering people behind bars.[45]

## SECURITY TECHNOLOGY

For years, facilities have purchased cameras and powered locks from security technology corporations. However, these corporations are increasingly developing and marketing new Orwellian technology to surveil people using biometric data, including their fingerprints, retinas, and, in some cases, even the way they walk.[46] And familiar consumer technology corporations like Microsoft and Amazon are also entering the space. Both have developed facial recognition technology being implemented in correctional facilities.[47] However, these new security technologies raise serious concerns.

For instance, existing facial recognition technology struggles to identify people of color accurately, which creates a significant risk of false identifications, especially among the disproportionately Black, Brown, and Indigenous prison population.[48] These identifications are often used in prison disciplinary hearings, where a false positive can lead to severe consequences: the denial of visits and calls, solitary confinement, or even the denial of parole – often without any legal recourse. While local municipalities have begun to pass legislation prohibiting this technology in the free world,[49] correctional administrators continue to implement it across prisons and jails without transparency or accountability.[50]

But these types false identifications are not limited to the analysis of biometric data. Security technology also includes forensic equipment like drug tests used to detect contraband narcotics and also often produce false positives with many of the same dire consequences for incarcerated people. In New York, for example, leaked documents confirmed not only an abundance of false positives in urinalysis tests conducted using Thermo Fisher Scientific testing equipment, but also false positives in field tests conducted directly on suspected substances using tests manufactured by Sirchie.[51] This faulty equipment caused many people to suffer for months in solitary confinement, some were even refused early release.[52] Notably, these tests are not just use in New York, but across the country in law enforcement, correctional, and even employment environments.

Equipment

36

# ■ LARRY'S STORY



**Larry Hardy**
**New York**

On a hot July day in 2019, corrections officers dragged me out of my cell and put me in handcuffs with their batons at their waists silently threatening violence. They threw me in solitary confinement without explanation and left me there for hours without anything as much as toilet paper. The next morning, I received a misbehavior report that stated I had tested positive for drug use. It was impossible, I knew I had not used anything.

As it turns out, I was among more than 2,000 incarcerated people who falsely tested positive for drugs in 2019 as a result of faulty testing equipment manufactured by Microgenics, a subsidiary of Thermo Fisher Scientific.

Despite my pleas of innocence, I was sanctioned with 90 days in solitary confinement, loss of all privileges, including regular and family reunification visits, and removal from all activities. Through the summer heat, I was confined to a closet-sized cell with no ventilation, stripped of any personal belongings, and limited to two showers a week. I was devastated, traumatized. My character, reputation, and credibility were defamed. I went into a hopeless state of depression, feeling like there was no chance that I would be vindicated. I questioned my faith.

Then, on my 67th day in solitary confinement, in late September, the reversal came down from prison administrators. Just like that, my false positive had been reversed, my sanctions ended, and I was returned to my cell in general population. It was as if nothing happened – but it had. A lot happened.

*This IS how we are TREATED AND you must make A example out of you*

In November, hundreds of formerly and currently incarcerated people, who suffered loss of calls and visits, solitary confinement, and even extended prison stays, filed a lawsuit against Thermo Fisher Scientific and the New York Department of Corrections and Community Supervision. While there has been momentum in the case and increased media coverage over the year since, my life and the lives of hundreds of others just in New York have been irreparably damaged. And how many other states and other agencies have used Thermo Fisher Scientific's faulty drug tests to destroy lives?

# ■ TRADE ASSOCATIONS

Trade shows are the most important marketing tool for correctional equipment and supplies corporations. The American Correctional Association (ACA), an influential industry trade group with over 20,000 members, holds the country's largest annual trade show, known as the "Congress of Corrections."[54] An astounding 81 percent of sales made by the corrections equipment and supplies industry occur at these trade shows.[55] The American Jail Association and Nation Sheriff's Association also host large trade shows each year.



This is a great opportunity to meet face-to-face with thousands of decision-makers who have the need and budgets for your products... We wish you a profitable 2018.

*American Correctional Association*[53]

Equipment

37

BP-A0808
SEP 11

**VACCINE CONSENT - INMATES**

CDFRM

## U.S. DEPARTMENT OF JUSTICE

## FEDERAL BUREAU OF PRISONS

{*Note: CDC Vaccine Information Statements in multiple languages available at: www.cdc.gov/vaccines/pubs/vis/}

I have been provided a copy of the Vaccine Information Statement* for:

_Hep B Vacc_ vaccine dated 7/20/2015

I have had the opportunity to ask questions about the benefits and risks of vaccination.

☑ I consent to be vaccinated.

| Inmate Signature | Witness Signature | Date |
|---|---|---|
| Leslie Garrison | | JAN 18 2019 |

☐ I decline to receive the above vaccine at this time.

| Inmate Signature | Witness Signature | Date |
|---|---|---|
| | | |

| Name | |
|---|---|
| LESLIE GARRISON | |
| **Reg. #** 54154-177 | **SSN** |
| **Institution** CRW--CARSWELL FMC | |

Prescribed By P6190

Nichols Institute, Chantilly

SPECIMEN INFORMATION
SPECIMEN:      CH604970M
REQUISITION: 0001819
LAB REF NO:   229780001819

COLLECTED: 07/07/2020      10:00
RECEIVED:  07/08/2020      17:54
REPORTED:  07/21/2020      09:56

PATIENT INFORMATION
**GARRISON,LESLIE**

DOB: 05/23/1981    Age: 39Y
SEX: F

ID: 54154-177
PHONE: 817 7824522

REPORT STATUS    **Final**

ORDERING PHYSICIAN
**LANGHAM,CHARLES G**
CLIENT INFORMATION
22978
FMC - CARSWELL - CRW
BLDG 3000
NAVAL AIR STATION J ST
FORT WORTH, TX 76127

---

COMMENTS:      185201458

| Test Name | In Range | Out of Range | Reference Range | Lab |
|---|---|---|---|---|
| SARS CoV 2 RNA(COVID 19), QL NAAT | | | | AMD |
| SARS CoV 2 RNA(COVID 19), QL NAAT | | | | |
| SARS CoV 2 RNA | Not Detected | | Not Detected | |

A Not Detected (negative) test result for this test
means that SARS-CoV-2 RNA was not present in the
specimen above the limit of detection.
A negative result does not rule out the possibility
of COVID-19 and should not be used as the
sole basis for treatment or patient management
decisions.  If COVID-19 is still suspected, based on
exposure history together with other clinical findings,
re-testing should be considered in consultation with
public health authorities. Laboratory test results
should always be considered in the context of clinical
observations and epidemiological data in making a
final diagnosis and patient management decisions.

Please review the "Fact Sheets" and FDA authorized
labeling available for health care providers and
patients using the following websites:
https://www.questdiagnostics.com/home/Covid-19/HCP/
NAAT/fact-sheet2.html
https://www.questdiagnostics.com/home/Covid-19/
Patients/NAAT/fact-sheet2.html

This test has been authorized by the FDA under an
Emergency Use Authorization (EUA) for use by authorized
laboratories.

Due to the current public health emergency, Quest
Diagnostics is receiving a high volume of samples from
a wide variety of swabs and media for COVID-19 testing.
In order to serve patients during this public health
crisis, samples from appropriate clinical sources are
being tested. Negative test results derived from
specimens received in non-commercially manufactured
viral collection and transport media, or in media and
sample collection kits not yet authorized by FDA for
COVID-19 testing should be cautiously evaluated and
the patient potentially subjected to extra precautions
such as additional clinical monitoring, including
collection of an additional specimen.

GARRISON,LESLIE - CH604970M

Page 1 - Continued on Page 2

Nichols Institute, Chantilly

PATIENT INFORMATION
**GARRISON,LESLIE**

DOB: 05/23/1981    Age: 39Y
SEX: F
ID: 54154-177

REPORT STATUS    **Final**

ORDERING PHYSICIAN
**LANGHAM,CHARLES G**

COLLECTED:  07/07/2020  10:00
REPORTED:   07/21/2020  09:56

| Test Name | In Range | Out of Range | Reference Range | Lab |
|---|---|---|---|---|

SARS CoV 2 RNA(COVID 19), QL NAAT (Continued)
    SARS CoV 2 RNA (Continued)

        Methodology:  Nucleic Acid Amplification Test (NAAT)
        includes PCR or TMA

        Additional information about COVID-19 can be found at
        the Quest Diagnostics website:
        www.QuestDiagnostics.com/Covid19

------------------------------------------------------------------------

**Performing Laboratory Information:**

AMD   Quest Diagnostics Nichols Institute 14225 Newbrook Drive Chantilly VA  20151 Laboratory Director: Patrick W Mason, M.D.

GARRISON,LESLIE - CH604970M

Nichols Institute, Chantilly

SPECIMEN INFORMATION
SPECIMEN:    CH845165M
REQUISITION: 0002917
LAB REF NO:   229780002917

COLLECTED:  07/15/2020      07:51
RECEIVED:   07/17/2020      19:34
REPORTED:   07/19/2020      04:16

PATIENT INFORMATION
**GARRISON,LESLIE**

DOB: 05/23/1981     Age: 39Y
SEX: F

ID: 54154-177
PHONE: 817 7824522

REPORT STATUS    **Final**

ORDERING PHYSICIAN
**WRIGHT,ANGELA**
CLIENT INFORMATION
22978
FMC - CARSWELL - CRW
BLDG 3000
NAVAL AIR STATION J ST
FORT WORTH, TX 76127

---

COMMENTS:    196203828

| Test Name | In Range | Out of Range | Reference Range | Lab |
|---|---|---|---|---|
| SARS CoV 2 RNA(COVID 19), QL NAAT | | | | |
|   SARS CoV 2 RNA(COVID 19), QL NAAT | | | | AMD |
|   SARS CoV 2 RNA | | Detected | Not Detected | |

A Detected result is considered a positive test result for COVID-19. This indicates that RNA from SARS-CoV-2 (formerly 2019-nCoV) was detected, and the patient is infected with the virus and presumed to be contagious. If requested by public health authority, specimen will be sent for additional testing.
CRITICAL VALUE REPORT

Please review the "Fact Sheets" and FDA authorized labeling available for health care providers and patients using the following websites:
https://www.questdiagnostics.com/home/Covid-19/HCP/QuestIVD/fact-sheet.html
https://www.questdiagnostics.com/home/Covid-19/Patients/QuestIVD/fact-sheet.html

This test has been authorized by the FDA under an Emergency Use Authorization (EUA) for use by authorized laboratories.

Due to the current public health emergency, Quest Diagnostics is receiving a high volume of samples from a wide variety of swabs and media for COVID-19 testing. In order to serve patients during this public health crisis, samples from appropriate clinical sources are being tested. Negative test results derived from specimens received in non-commercially manufactured viral collection and transport media, or in media and sample collection kits not yet authorized by FDA for COVID-19 testing should be cautiously evaluated and the patient potentially subjected to extra precautions such as additional clinical monitoring, including collection of an additional specimen.

Methodology:  Nucleic Acid Amplification Test (NAAT) includes PCR or TMA

Additional information about COVID-19 can be found at the Quest Diagnostics website:
www.QuestDiagnostics.com/Covid19

GARRISON, LESLIE - CH845165M

Page 1 - Continued on Page 2

| | PATIENT INFORMATION<br>**GARRISON,LESLIE** | REPORT STATUS   **Final** |
|---|---|---|
| Nichols Institute, Chantilly | | ORDERING PHYSICIAN |
| | DOB: 05/23/1981   Age: 39Y | **WRIGHT,ANGELA** |
| COLLECTED: 07/15/2020   07:51 | SEX: F | |
| REPORTED:   07/19/2020   04:16 | ID: 54154-177 | |

## Performing Laboratory Information:

AMD   Quest Diagnostics Nichols Institute 14225 Newbrook Drive Chantilly VA  20151 Laboratory Director: Patrick W Mason, M.D.

GARRISON,LESLIE - CH845165M

Page 2 - End of Report

# Bureau of Prisons
## Health Services
## Clinical Encounter - Administrative Note

| | | | | |
|---|---|---|---|---|
| Inmate Name: | GARRISON, LESLIE JEAN | | Reg #: | 54154-177 |
| Date of Birth: | 05/23/1981 | Sex: F Race: WHITE | Facility: | CRW |
| Note Date: | 07/03/2020 16:17 | Provider: Okoh, Chucky FNP-C | Unit: | 104 |

Admin Note - Orders encounter performed at Health Services.

**Administrative Notes:**

ADMINISTRATIVE NOTE   1        Provider:   Okoh, Chucky FNP-C
Labs due to COVID-19 outbreak

**New Laboratory Requests:**

| Details | Frequency | Due Date | Priority |
|---|---|---|---|
| Lab Tests-C-COVID-19 Asymptomatic Novel Coronavirus | One Time | 07/20/2020 00:00 | Routine |
| Labs requested to be reviewed by: | Jowdy, James DO | | |

**Copay Required:** No        **Cosign Required:** No

**Telephone/Verbal Order:** No

Completed by Okoh, Chucky FNP-C on 07/03/2020 16:18

Generated 07/03/2020 16:18 by Okoh, Chucky FNP-C        Bureau of Prisons - CRW

**Bureau of Prisons**
**Health Services**
## Clinical Encounter - Administrative Note

| | | | | | |
|---|---|---|---|---|---|
| Inmate Name: | GARRISON, LESLIE JEAN | | | Reg #: | 54154-177 |
| Date of Birth: | 05/23/1981 | Sex: F | Race: WHITE | Facility: | CRW |
| Note Date: | 07/14/2020 16:25 | Provider: | Wright, Angie RN, MSN, | Unit: | I04 |

Admin Note - Orders encounter performed at Health Services.
**Administrative Notes:**

ADMINISTRATIVE NOTE   1          Provider:   Wright, Angie RN, MSN, NP-C
Sars-CoV-2 test order

## New Laboratory Requests:

| Details | Frequency | Due Date | Priority |
|---|---|---|---|
| Lab Tests-C-COVID-19 Novel Coronavirus | One Time | 07/17/2020 00:00 | Routine |
| Labs requested to be reviewed by: | Jowdy, James DO | | |

Copay Required: No              Cosign Required:  No
Telephone/Verbal Order:   No

Completed by Wright, Angie RN, MSN, NP-C on 07/14/2020 16:26

# Bureau of Prisons
## Health Services
## Clinical Encounter - Administrative Note

| | | | | | |
|---|---|---|---|---|---|
| Inmate Name: | GARRISON, LESLIE JEAN | | | Reg #: | 54154-177 |
| Date of Birth: | 05/23/1981 | Sex: F | Race:WHITE | Facility: | CRW |
| Note Date: | 07/19/2020 14:56 | Provider: | Wright, Angie RN, MSN, | Unit: | I04 |

Review Note - Report Review encounter performed at Health Services.
**Administrative Notes:**

ADMINISTRATIVE NOTE   1        Provider:   Wright, Angie RN, MSN, NP-C
          PCR + for COVID 19

**ASSESSMENTS:**

Confirmed case COVID-19, U07.1 - Current

**Copay Required:** No          **Cosign Required:** No
**Telephone/Verbal Order:** No

Completed by Wright, Angie RN, MSN, NP-C on 07/19/2020 14:57

# Bureau of Prisons
## Health Services
## Clinical Encounter

| | | |
|---|---|---|
| Inmate Name: GARRISON, LESLIE JEAN | | Reg #: 54154-177 |
| Date of Birth: 05/23/1981 | Sex: F   Race: WHITE | Facility: CRW |
| Encounter Date: 07/29/2020 15:32 | Provider: Sotayo, O. APRN,FNP-C | Unit: I04 |

Mid Level Provider - Evaluation encounter performed at Health Services.

**SUBJECTIVE:**

COMPLAINT 1        Provider: Sotayo, O. APRN,FNP-C

Chief Complaint: GENERAL

Subjective: S: 39yrs old White female >10 days post (+) COVID testing with improvement/absence of symptoms and fever free for over 24 hours without antipyretics.

O: GEN- NAD, afebrile, Ambulatory without any difficulty. No jaundice/pallor/diaphoresis/cyanosis. Good affect and cooperative
PULM- CTAB, No wheezing/rhonchi
CARD: RR, normal S1S2

A: Resolve Coronavirus COVID-19

*[handwritten: False statement to make readers think we could.
Facts are we would NEVER HERD]*

P: Instructed Patient to continue social distancing, use a face mask in the midst of others and proper hand hygiene and she verbalized understanding.

Pain:    No *[handwritten: ↑ NO SOAP!]*

*[handwritten: staff does not follow this!]*
*[handwritten: ? 4 people one room! we are always in midst of others! False statement]*

**OBJECTIVE:**
*[handwritten: Soap is poison! See attached Exhibit. Also we had no soap nor killer soap]*

**Temperature:**

| Date | Time | Fahrenheit | Celsius | Location | Provider |
|---|---|---|---|---|---|
| 07/29/2020 | 15:31 CRW | 97.4 | 36.3 | | Sotayo, O. APRN,FNP-C |
| 07/28/2020 | 13:47 CRW | 97.7 | 36.5 | Forehead | Rios, Matthew MD |
| | 98% O2 sat | | | | |
| 07/27/2020 | 11:36 CRW | 96.9 | 36.1 | | Timmons, G. PT,DPT |

*[handwritten: Were are all other dates? # missing]*

Inmate on COVID-positive unit 2S. NAD. No complaints. No new changes. Appears well. 97% SpO2 on RA, no change in status. No sick call this am. *[handwritten: ← False]*

**Pulse:**

| Date | Time | Rate Per Minute | Location | Rhythm | Provider |
|---|---|---|---|---|---|
| 07/29/2020 | 15:31 | 76 | | | Sotayo, O. APRN,FNP-C |

**Respirations:**

| Date | Time | Rate Per Minute | Provider |
|---|---|---|---|
| 07/29/2020 | 15:31 CRW | 20 | Sotayo, O. APRN,FNP-C |

**SaO2:**

| Date | Time | Value(%) | Air | Provider |
|---|---|---|---|---|
| 07/29/2020 | 15:31 CRW | 99 | Room Air | Sotayo, O. APRN,FNP-C |

**ASSESSMENT:**

Confirmed case COVID-19, U07.1 - Resolved

Inmate Name: GARRISON, LESLIE JEAN     Sex: F   Race: WHITE     Reg #84 541342     Facility: CRW
Date of Birth: 05/23/1981
Encounter Date: 07/29/2020 15:32     Provider: Sotayo, O. APRN,FNP-C     Unit: I04

## PLAN:

**Disposition:**

Follow-up at Sick Call as Needed

**Other:**

As above

**Patient Education Topics:**

| Date Initiated | Format | Handout/Topic | Provider | Outcome |
|---|---|---|---|---|
| 07/29/2020 | Counseling | Access to Care | Sotayo, O. | Verbalizes Understanding |

**Copay Required:** No      **Cosign Required:** No

**Telephone/Verbal Order:** No

Completed by Sotayo, O. APRN,FNP-C on 07/29/2020 15:34

## Bureau of Prisons
## Health Services
## Clinical Encounter

| | | | |
|---|---|---|---|
| Inmate Name: | GARRISON, LESLIE JEAN | | Reg #: 54154-177 |
| Date of Birth: | 05/23/1981 | Sex: F  Race: WHITE | Facility: CRW |
| Encounter Date: | 12/04/2017 08:29 | Provider: Silvas, Jose MD | Unit: I03 |

Chronic Care - Chronic Care Clinic encounter performed at Health Services.

**SUBJECTIVE:**

**COMPLAINT 1**          **Provider:** Silvas, Jose MD

**Chief Complaint:** Behavioral Health Problem

**Subjective:** PSYCHIATRIC EVALUATION: 32 YEAR OLD unit 2 inmate serving 12 year sentence.

HPI: Inmate arrives to serve sentence prescribed medication for a year for depression and anxiety and paranoia and anger prescribed by a psychiatrist in jail. She was treated for ADHD and depression in childhood but had not been treated again until she was in jail. She reports no treatment before being arrested because she was drinking and doing drugs. She denies psychiatric admissions as well as suicide attempts. She missed a previous appointment intake due to going to the SHU for substance abuse. She also has been treated with Zoloft but did not like it, then Elavil for only 3 days, and finally Prozac.

Medical Hx: allergic to PCN; history of prior seizures but not diagnosed with seizure disorder. G1P1; smoked tobacco for 15 years; consumes one cup of coffee per day; denies active medical problem; denies major surgery

Family MH Hx: maternal uncles with depression; no suicides reported

Substance abuse Hx: alcohol and drug abuse began at age 14 with acid and cocaine and cannibus and as an adult included methamphetamine

Abuse Hx: reports physical, sexual, and emotional abuse since childhood

Social Hx: obtained GED; married twice; longest employment for a year as a waitress

Criminal Hx: no state prison sentences and this is first Federal sentence

**Pain:** Not Applicable

**Seen for clinic(s):** Mental Health
**Added to clinic(s):** Mental Health

**ROS:**
**Psychiatric**
**General**
Yes: Mood-Down, Anxiety-Moderate, Sleep-Decreased, Energy Impaired, Paranoid/Guarded/Suspicious
No: Appetite Impaired, Concentration-Decreased, Memory Impaired, Hallucinations, Suicide/Self-Harm Thoughts, Homicide/Other Harm Thoughts

**OBJECTIVE:**

**Exam:**
**Mental Health**
**Posture**
Yes: Within Normal Limits, Upright, Attentive
No: Tense, Agitated, Restless, Involuntary Movements

# Bureau of Prisons
## Health Services
## Cosign/Review

| | | | | | |
|---|---|---|---|---|---|
| Inmate Name: | GARRISON, LESLIE JEAN | | | Reg #: | 54154-177 |
| Date of Birth: | 05/23/1981 | Sex: | F | Race: | WHITE |
| Encounter Date: | 12/09/2017 22:06 | Provider: | Varghese, Pheba RN | Facility: | CRW |

**Reviewed by Parra, Beatriz MD on 12/12/2017 12:10.**

Inmate Name: GARRISON, LESLIE JEAN  Sex: F  Race: WHITE  Facility: CRW
Date of Birth: 05/23/1981
Encounter Date: 12/04/2017 08:29  Provider: Silvas, Jose MD  Unit: I03

| | | | |
|---|---|---|---|
| Chronic Care Clinics-Mental Health-CBC w/diff | Recurring | 03/18/2018 00:00 | Routine |
| Chronic Care Clinics-Mental Health-TSH | | | |
| Chronic Care Clinics-Mental Health-Carbamazepine | | | |
| Chronic Care Clinics-Mental Health-Comprehensive Metabolic Profile (CMP) | | | |
| Chronic Care Clinics-Mental Health-CBC w/diff | Recurring | 06/18/2018 00:00 | Routine |
| Chronic Care Clinics-Mental Health-TSH | | | |
| Chronic Care Clinics-Mental Health-Carbamazepine | | | |
| Chronic Care Clinics-Mental Health-Comprehensive Metabolic Profile (CMP) | | | |
| Chronic Care Clinics-Mental Health-CBC w/diff | Recurring | 09/18/2018 00:00 | Routine |
| Chronic Care Clinics-Mental Health-TSH | | | |
| Chronic Care Clinics-Mental Health-Carbamazepine | | | |
| Chronic Care Clinics-Mental Health-Comprehensive Metabolic Profile (CMP) | | | |

**Schedule:**

| **Activity** | **Date Scheduled** | **Scheduled Provider** |
|---|---|---|
| Chronic Care Visit | 03/05/2018 00:00 | Physician 14 |

**Other:**

Inmate off meds 5 days. She spent 45 days in SHU for abuse of tegretol from the compound but was self treating the chronic history of anxiety and mood symptoms that only began treatment again in jail. Since anxiety and ADHD were considered in childhood and she has a long sentence providing stable medication treatment that we can evaluate for efficacy is now in her best interest and she agrees to begin now with tegretol due to positive response along with Prozac and not with abilify. Comorbid almost lifelong substance abuse will continue to be a significant obstacle for her to avoid drugs on the compound but I discuss this treatment goal and she seems motivated to take action. Also she does not think the buspar has any effect and will not be reordered.

**Patient Education Topics:**

| **Date Initiated** | **Format** | **Handout/Topic** | **Provider** | **Outcome** |
|---|---|---|---|---|
| 12/04/2017 | Counseling | New Medication | Silvas, Jose | Verbalizes Understanding |

**Copay Required:** No   **Cosign Required:** No
**Telephone/Verbal Order:** No

Completed by Silvas, Jose MD on 12/04/2017 09:25

Generated 12/04/2017 09:25 by Silvas, Jose MD          Bureau of Prisons - CRW          Page 3 of 3

Inmate Name: GARRISON, LESLIE JEAN
Date of Birth:    05/23/1981
Encounter Date:  12/04/2017 08:29

Sex:      F      Race:  WHITE
Provider:  Silvas, Jose MD

Facility:  CRW
Unit:      I03

## Exam:

### Affect
Yes: Anxious

### Speech/Language
Yes: Normal Articulation, Responsive to Questions, Spontaneous

### Mood
Yes: Dysphoric

### Thought Process
Yes: Logical, Goal Directed

### Thought Content
Yes: Goal Directed

No: Delusional, Suicidal or Homicidal Ideation

### Perceptions
No: Hallucinations-Auditory

### Orientation
Yes: Alert and Oriented x 3

### Attention
Yes: Appropriate

### Recent Memory
Yes: Accurate

### Abstract Thinking
Yes: Appropriate

## ASSESSMENT:

Anxiety disorder, F419 - Current

Unspecified mood [affective] disorder, F39 - Current

## PLAN:

### New Medication Orders:

| Rx# | Medication | Order Date | Prescriber Order |
|---|---|---|---|
| | FLUoxetine Capsule | 12/04/2017 08:29 | 20 mg Orally  at noon x 180 day(s) Pill Line Only |
| | **Indication:** Unspecified mood [affective] disorder, Anxiety disorder | | |
| | carBAMazepine ER 12 Hour Tablet | 12/04/2017 08:29 | 200 mg Orally  -  Two Times a Day x 180 day(s) Pill Line Only -- at noon and HS |
| | **Indication:** Unspecified mood [affective] disorder, Anxiety disorder | | |

### New Laboratory Requests:

| Details | Frequency | Due Date | Priority |
|---|---|---|---|
| Chronic Care Clinics-Mental Health-CBC w/diff | Recurring | 12/18/2017 00:00 | Routine |
| Chronic Care Clinics-Mental Health-TSH | | | |
| Chronic Care Clinics-Mental Health-Carbamazepine | | | |
| Chronic Care Clinics-Mental Health-Comprehensive Metabolic Profile (CMP) | | | |

# Bureau of Prisons
## Health Services
## Clinical Encounter

| | | | |
|---|---|---|---|
| Inmate Name: GARRISON, LESLIE JEAN | | Reg #: | 54154-177 |
| Date of Birth: 05/23/1981 | Sex: F  Race: WHITE | Facility: | CRW |
| Encounter Date: 03/21/2018 07:03 | Provider: Silvas, Jose MD | Unit: | Z01 |

Chronic Care - Chronic Care Clinic encounter performed at Special Housing Unit.

## SUBJECTIVE:

**COMPLAINT 1**          **Provider:** Silvas, Jose MD

**Chief Complaint:** Behavioral Health Problem

**Subjective:** 36 year old inmate treated for mood and anxiety symptoms examined in SHU where she had to have tegretol stopped due to hyponatremia and she is now requesting alternative treatment reporting that mood and anxiety instability seems worse without tegretol on Prozac alone. I educate her that in special housing it is advisable to participate in all available out of cell activities and attend to her hygiene as important methods to manage her time in secure housing. We also discuss alternative treatments Depakote and Zyprexa and I advise her to choose one to add to and continue Prozac until she is released from SHU for her to schedule an outpatient follow up appointment to evaluate her symptoms in general population. She consents to proceed with a new prescription for Depakote and she requests that it not be prescribed in the morning to avoid missing the pill line.

**Pain:** Not Applicable

**Seen for clinic(s):** Mental Health

## ROS:

**Psychiatric**
**General**
Yes: Mood-Erratic, Anxiety-Moderate

No: Sleep Impaired, Energy Impaired, Appetite Impaired, Concentration-Decreased, Memory Impaired, Hallucinations, Suicide/Self-Harm Thoughts, Homicide/Other Harm Thoughts, Appears Down, Paranoid/Guarded/Suspicious

## OBJECTIVE:

## Exam:

**Mental Health**
**Posture**
Yes: Within Normal Limits, Upright, Attentive

No: Tense, Agitated, Restless, Involuntary Movements

**Affect**
Yes: Constricted

**Speech/Language**
Yes: Normal Articulation, Responsive to Questions

**Mood**
Yes: Dysphoric

**Thought Process**
Yes: Logical, Goal Directed

**Thought Content**
Yes: Appropriate, Goal Directed

No: Delusional, Suicidal or Homicidal Ideation

Inmate Name: GARRISON, LESLIE JEAN          Reg #: 54154-077

Date of Birth: 05/23/1981          Sex:     F     Race: WHITE          Facility: CRW

Encounter Date: 03/21/2018 07:03          Provider: Silvas, Jose MD          Unit:     Z01

---

## Exam:

### Perceptions
  Yes: Appropriate

  No: Hallucinations-Auditory

### Orientation
  Yes: Alert and Oriented x 3

### Attention
  Yes: Appropriate

### Recent Memory
  Yes: Accurate

### Abstract Thinking
  Yes: Appropriate

## ASSESSMENT:

Anxiety disorder, F419 - Current

Unspecified mood [affective] disorder, F39 - Current

## PLAN:

### New Medication Orders:

| Rx# | Medication | Order Date | Prescriber Order |
|---|---|---|---|
|  | Divalproex ER 24 Hour Tablet | 03/21/2018 07:03 | 250 mg Orally at bedtime x 180 day(s) Pill Line Only |

**Indication:** Unspecified mood [affective] disorder, Anxiety disorder

### Renew Medication Orders:

| Rx# | Medication | Order Date | Prescriber Order |
|---|---|---|---|
| 579420-CRW | FLUoxetine HCl 20 MG Cap | 03/21/2018 07:03 | Take one capsule (20 MG) by mouth at noon each day for depression ***pill line*** *consent form on file * x 180 day(s) Pill Line Only |

**Indication:** Unspecified mood [affective] disorder, Anxiety disorder

### New Laboratory Requests:

| Details | Frequency | Due Date | Priority |
|---|---|---|---|
| Chronic Care Clinics-Mental Health-CBC w/diff Chronic Care Clinics-Mental Health-TSH Chronic Care Clinics-Mental Health-Valproic Acid, Total Chronic Care Clinics-Mental Health-Comprehensive Metabolic Profile (CMP) | Recurring | 04/11/2018 00:00 | Routine |
| Chronic Care Clinics-Mental Health-CBC w/diff Chronic Care Clinics-Mental Health-TSH Chronic Care Clinics-Mental Health-Valproic Acid, Total Chronic Care Clinics-Mental Health-Comprehensive Metabolic Profile (CMP) | Recurring | 07/11/2018 00:00 | Routine |

---

**Bureau of Prisons**
## Health Services
## Clinical Encounter

| | | |
|---|---|---|
| Inmate Name: GARRISON, LESLIE JEAN | Sex: F    Race: WHITE | Reg #: 54154-177 |
| Date of Birth: 05/23/1981 | Provider: Silvas, Jose MD | Facility: CRW |
| Encounter Date: 07/19/2018 15:10 | | Unit: I04 |

Chronic Care - Chronic Care Clinic encounter performed at Health Services.

**SUBJECTIVE:**

**COMPLAINT 1**         **Provider:** Silvas, Jose MD

**Chief Complaint:** Behavioral Health Problem

**Subjective:** 37 year old inmate treated for mood disorder reports a series of complications with her family who care for her 5 year old son that she is powerless to do anything about. She has recently been diagnosed with hypothyroidism and started on medication. She denies any improvement in mood with Depakote and Prozac with persistence of insomnia, tearfulness, anxiety, and sadness. We agree to stop Depakote, begin trileptal, continue Prozac while she hopefully improves with thyroid treatment as well.

**Pain:** Not Applicable

**Seen for clinic(s):** Mental Health

**ROS:**

**Psychiatric**

**General**

Yes: Mood Impaired, Anxiety-Moderate, Sleep-Decreased, Energy-Decreased

No: Appetite Impaired, Concentration-Decreased, Memory Impaired, Hallucinations, Suicide/Self-Harm Thoughts, Homicide/Other Harm Thoughts, Paranoid/Guarded/Suspicious

**OBJECTIVE:**

**Exam:**

**Mental Health**

**Posture**

Yes: Within Normal Limits, Upright, Attentive, Tense

No: Agitated, Restless, Involuntary Movements

**Affect**

Yes: Anxious, Constricted

**Speech/Language**

Yes: Normal Articulation

**Mood**

Yes: Sadness

**Thought Process**

Yes: Logical, Goal Directed

**Thought Content**

Yes: Goal Directed

No: Delusional, Suicidal or Homicidal Ideation

**Perceptions**

Yes: Appropriate

No: Hallucinations-Auditory

**Orientation**

Yes: Alert and Oriented x 3

**Attention**

Inmate Name: GARRISON, LESLIE JEAN      Reg #: 54154-177
Date of Birth: 05/23/1981     Sex: F    Race: WHITE     Facility: CRW
Encounter Date: 07/19/2018 15:10    Provider: Silvas, Jose MD     Unit: 104

## Exam:

Yes: Appropriate

### Recent Memory

Yes: Accurate

### Abstract Thinking

Yes: Appropriate

## ASSESSMENT:

Unspecified mood [affective] disorder, F39 - Current

## PLAN:

### New Medication Orders:

| Rx# | Medication | Order Date | Prescriber Order |
|---|---|---|---|
| | OXcarbazepine Tablet | 07/19/2018 15:10 | 600 mg Orally at bedtime x 365 day(s) Pill Line Only |

Indication: Unspecified mood [affective] disorder

### Renew Medication Orders:

| Rx# | Medication | Order Date | Prescriber Order |
|---|---|---|---|
| 593815-CRW | FLUoxetine HCl 20 MG Cap | 07/19/2018 15:10 | Take one capsule (20 MG) by mouth at noon each day for depression ***pill line*** *consent form on file * x 365 day(s) Pill Line Only |

Indication: Unspecified mood [affective] disorder, Anxiety disorder

### Discontinued Medication Orders:

| Rx# | Medication | Order Date | Prescriber Order |
|---|---|---|---|
| 593814-CRW | Divalproex ER 24 Hour Tab 250 MG | 07/19/2018 15:10 | Take one tablet (250 MG) by mouth at bedtime for mood ***pill line*** *consent form on file * |

Discontinue Type:    When Pharmacy Processes

Discontinue Reason: discontinue

Indication:

### Discontinued Laboratory Requests:

| Details | Frequency | Due Date | Priority |
|---|---|---|---|
| Chronic Care Clinics-Mental Health-CBC w/diff Chronic Care Clinics-Mental Health-TSH Chronic Care Clinics-Mental Health-Valproic Acid, Total Chronic Care Clinics-Mental Health-Comprehensive Metabolic Profile (CMP) | Recurring | 10/11/2018 00:00 | Routine |
| Chronic Care Clinics-Mental Health-CBC w/diff Chronic Care Clinics-Mental Health-TSH Chronic Care Clinics-Mental Health-Valproic Acid, Total Chronic Care Clinics-Mental Health-Comprehensive Metabolic Profile (CMP) | Recurring | 01/11/2019 00:00 | Routine |

### New Laboratory Requests:

| Details | Frequency | Due Date | Priority |
|---|---|---|---|
| Lab Tests-S-Sodium | Recurring | 08/15/2018 00:00 | Routine |
| Lab Tests-S-Sodium | Recurring | 11/15/2018 00:00 | Routine |

**Bureau of Prisons**
## Health Services
## Clinical Encounter

| | |
|---|---|
| Inmate Name: GARRISON, LESLIE JEAN | Reg #: 54154-177 |
| Date of Birth: 05/23/1981 | Sex: F   Race: WHITE   Facility: CRW |
| Encounter Date: 02/26/2019 15:00 | Provider: Silvas, Jose MD   Unit: I03 |

Chronic Care - Chronic Care Clinic encounter performed at Health Services.

### SUBJECTIVE:

**COMPLAINT 1**          **Provider:** Silvas, Jose MD

**Chief Complaint:** Behavioral Health Problem

**Subjective:** 37 year old inmate treated for mood and anxiety symptoms had to stop trileptal due to hyponatremia and has not stabilized on Depakote, Effexor, tegretol, lamictal and Prozac and Zoloft. Her mood remains irritable and depressed and anxious. She does report prior response to wellbutrin but also feels that a mood stabilizer will be necessary. I agree to submit recommendation for wellbutrin and Topamax. Also treated for thyroid disease.

**Pain:** Not Applicable

**Seen for clinic(s):** Mental Health

### ROS:

**Psychiatric**

**General**

Yes: Mood-Down, Mood-Erratic, Anxiety-Moderate, Sleep Impaired, Energy Impaired, Concentration-Decreased, Appears Down, Restless/Fidgety

No: Appetite Impaired, Memory Impaired, Hallucinations, Suicide/Self-Harm Thoughts, Homicide/Other Harm Thoughts, Uncooperative/Argumentative, Angry/Irritable, Hostile/Threatening, Agitated/Distressed, Paranoid/Guarded/Suspicious

### OBJECTIVE:

### Exam:

**Mental Health**

**Posture**

Yes: Tense, Restless

No: Involuntary Movements

**Affect**

Yes: Anxious, Constricted

**Speech/Language**

Yes: Talkative

**Mood**

Yes: Dysphoric

**Thought Process**

Yes: Goal Directed

**Thought Content**

Yes: Goal Directed

No: Delusional, Suicidal or Homicidal Ideation

**Perceptions**

No: Hallucinations-Auditory

**Orientation**

Yes: Alert and Oriented x 3

**Attention**

# Bureau of Prisons
## Health Services
## Clinical Encounter - Administrative Note

| | | | | | |
|---|---|---|---|---|---|
| Inmate Name: | GARRISON, LESLIE JEAN | | | Reg #: | 54154-177 |
| Date of Birth: | 05/23/1981 | Sex: F | Race: WHITE | Facility: | CRW |
| Note Date: | 02/28/2019 14:43 | Provider: | Silvas, Jose MD | Unit: | I03 |

Admin Note - Orders encounter performed at Health Services.
**Administrative Notes:**

> **ADMINISTRATIVE NOTE   1**        **Provider:** Silvas, Jose MD
> NF wellbutrin and Topamax approved

**New Medication Orders:**

| Rx# | Medication | Order Date | Prescriber Order |
|---|---|---|---|
| | buPROPion Tablet | 02/28/2019 14:43 | 100 mg Orally - Two Times a Day x 180 day(s) Pill Line Only -- AM and Noon |

**Indication:** Unspecified mood [affective] disorder, Anxiety disorder

| | | | |
|---|---|---|---|
| | Topiramate Tablet | 02/28/2019 14:43 | 50 mg Orally - Two Times a Day x 180 day(s) Pill Line Only -- AM and HS |

**Indication:** Unspecified mood [affective] disorder, Anxiety disorder

**Discontinued Medication Orders:**

| Rx# | Medication | Order Date | Prescriber Order |
|---|---|---|---|
| | *buPROPion Tablet* | *02/28/2019 14:43* | *100 mg Orally - Two Times a Day x 180 day(s) Pill Line Only -- at AM and NOON* |

**Discontinue Type:**    *When Pharmacy Processes*
**Discontinue Reason:** *discontinue*
**Indication:**

| | | | |
|---|---|---|---|
| | *Topiramate Tablet* | *02/28/2019 14:43* | *50 mg Orally - Two Times a Day x 180 day(s) Pill Line Only -- at AM and HS* |

**Discontinue Type:**    *When Pharmacy Processes*
**Discontinue Reason:** *discontinue*
**Indication:**

**Copay Required:** No        **Cosign Required:** No
**Telephone/Verbal Order:**  No

Completed by Silvas, Jose MD on 02/28/2019 14:46

# Bureau of Prisons
## Health Services
## Clinical Encounter

| | | | |
|---|---|---|---|
| Inmate Name: GARRISON, LESLIE JEAN | | Reg #: | 54154-177 |
| Date of Birth: 05/23/1981 | Sex: F Race: WHITE | Facility: | CRW |
| Encounter Date: 11/07/2019 14:09 | Provider: Silvas, Jose MD | Unit: | I04 |

Chronic Care - Chronic Care Clinic encounter performed at Health Services.

**SUBJECTIVE:**

**COMPLAINT 1**          **Provider:** Silvas, Jose MD

**Chief Complaint:** Behavioral Health Problem

**Subjective:** 38 year old inmate treated for mood and anxiety symptoms. Wellbutrin was discontinued due to diversion. Then she went to the SHU when found in possession of trileptal. Today she reports ADHD symptoms have returned being off Wellbutrin. She declines considering Effexor alternative saying she did not tolerate it before being incarcerated. She declines considering imipramine alternative. She accepts trying dose adjustment in Topamax that she reports has lost its effect for mood stability. I emphasize to her that if she continues to seek substances on the compound to self medicate with the Topamax effect will not benefit her. I also emphasize the importance of taking all prescribed doses of Topamax if she wants the benefit because she admits she does miss morning doses.

**Pain:** Not Applicable

**Seen for clinic(s):** Mental Health

**ROS:**

**Psychiatric**

**General**

Yes: Mood Impaired, Anxiety-Moderate, Concentration-Decreased

No: Sleep Impaired, Energy Impaired, Appetite Impaired, Memory Impaired, Hallucinations, Suicide/Self-Harm Thoughts, Homicide/Other Harm Thoughts, Appears Down, Paranoid/Guarded/Suspicious, Restless/Fidgety

**OBJECTIVE:**

**Exam:**

**Mental Health**

**Posture**

Yes: Tense

No: Agitated, Restless, Involuntary Movements

**Affect**

Yes: Constricted

**Speech/Language**

Yes: Normal Articulation, Responsive to Questions

**Mood**

Yes: Dysphoric

**Thought Process**

Yes: Logical, Goal Directed

**Thought Content**

Yes: Goal Directed

No: Delusional, Suicidal or Homicidal Ideation

**Perceptions**

No: Hallucinations-Auditory

**Orientation**

# Bureau of Prisons
## Health Services
## Cosign/Review

| | | | | | | |
|---|---|---|---|---|---|---|
| Inmate Name: | GARRISON, LESLIE JEAN | | | Reg #: | 54154-177 | |
| Date of Birth: | 05/23/1981 | Sex: | F | Race: | WHITE | |
| Encounter Date: | 12/04/2019 10:36 | Provider: | Valenzuela, Kristina RN | Facility: | CRW | |

**Reviewed by Silvas, Jose MD on 12/04/2019 12:17.**

# Bureau of Prisons
## Health Services
## Clinical Encounter

---

Inmate Name:  GARRISON, LESLIE JEAN                                    Reg #:     54154-177
Date of Birth:   05/23/1981                    Sex:      F    Race:  WHITE    Facility:  CRW
Encounter Date:  04/27/2020 11:39              Provider:  Meisamy, Lili D.O.    Unit:      I04

---

Psychiatry - Follow up Visit encounter performed at Health Services.

**SUBJECTIVE:**

**COMPLAINT  1**          **Provider:** Meisamy, Lili D.O.

**Chief Complaint:** MENTAL HEALTH
**Subjective:**    Ms. Garrison is a 38-yo MHCL-1/Medical CL-1 inmate per her request during rounds on unit.
                   Last eval by psychiatry on 11/2019.
**Pain:**          Not Applicable

---

**COMPLAINT  2**          **Provider:** Meisamy, Lili D.O.

**Chief Complaint:** MENTAL HEALTH
**Subjective:**    CC: "I'm wondering with being lock down, I've been off my job and I did things w my hands
                   and got off my unit for 2 and 1/2-years b/c communication is not essential and it's driving me
                   crazy.  Can I get my Topamax upped or something?"
**Pain:**          Yes

**Pain Assessment**
  **Date:**                      04/27/2020 11:41
  **Location:**                  Shoulder-Left
  **Quality of Pain:**           Aching
  **Pain Scale:**                5
  **Intervention:**              ibuprofen
  **Trauma Date/Year:**
  **Injury:**                    abnormal meniscus + multiple falls and playing softball
  **Mechanism:**
  **Onset:**                     1-5 Hours
  **Duration:**                  6-12 Months
  **Exacerbating Factors:**      position
  **Relieving Factors:**         massage and certain positions
  **Reason Not Done:**
  **Comments:**

---

**ROS:**
  **Psychiatric**
    **General**
      Yes: Mood-Down, Anxiety-Moderate, Sleep-Decreased, Appetite-Increased, Memory Impaired
      No: Energy Impaired, Weight Loss, Concentration-Decreased, Hallucinations, Suicide/Self-Harm Thoughts,
      Homicide/Other Harm Thoughts

**OBJECTIVE:**

**Exam:**
  **Mental Health**
    **Posture**
      Yes: Within Normal Limits, Upright, Attentive
      No: Tense, Agitated, Restless, Slowed Movements, Involuntary Movements

---

Inmate Name:  GARRISON, LESLIE JEAN                                                    Reg #:  54734977
Date of Birth:   05/23/1981                          Sex:      F     Race:   WHITE        Facility:  CRW
Encounter Date:  04/27/2020 11:39           Provider:   Meisamy, Lili D.O.               Unit:      I04

---

## Exam:

### Grooming/Hygiene
Yes: Within Normal Limits, Appropriate Grooming
No: Poor Grooming, Malodorous, Soiled

### Facial Expressions
No: Tardive Dyskinesia

### Affect
Yes: Anxious, Constricted
No: Hostility, Suspicousness, Evasive, Apathy

### Speech/Language
Yes: Within Normal Limits, Appropriate, Normal Rate, Normal Articulation, Talkative

### Mood
Yes: Sadness, Worry
No: Anger, Detachment

### Thought Process
Yes: Logical, Goal Directed

### Thought Content
Yes: Anxious
No: Delusional, Suicidal or Homicidal Ideation

### Perceptions
Yes: Within Normal Limits

### Orientation
Yes: Within Normal Limits

### Attention
Yes: Appropriate

### Recent Memory
Yes: Appropriate

### Information/Vocabulary
Yes: Well Preserved

### Abstract Thinking
Yes: Abstract Response

## ROS Comments

having problems w memory in that she's having problem sorting things out like remember the sequence of events when she tries--difficulty w retrieval.

## ASSESSMENT:

Unspecified mood [affective] disorder, F39 - Current

## PLAN:

**New Medication Orders:**

| Rx# | Medication | Order Date |
|-----|------------|------------|
|     | Topiramate Tablet | 04/27/2020 11:39 |

**Prescriber Order:**  50mg Orally  -   Two Times a Day x 365 day(s) Pill Line Only -- 100mg PO QAM and 150mg PO QHS

**Indication:** Unspecified mood [affective] disorder

---

Generated 04/27/2020 12:43 by Meisamy, Lili D.O.          Bureau of Prisons - CRW                          Page 2 of 3

①

District Court For
The Fifth Circuit
Fort Worth Division

Leslie Garrison,
    Plaintiff

V.                                        BOP FMC Carswell
                                          P.O. Box 27137
                                          Fort Worth, Tx. 76127
Warden Carr
BOP, FMC Carswell

Motion Under 42 U.S.C. §1983
Reviews Action and 42 USC §1985,
1986: Civil Rights Conspiracy claims

It all started during the semi-lockdown when a sanitation worker got sick. We were on this lockdown due to Texas being locked down for Covid-19. It was to restrict movement. Sanitation, the kitchen, UNITS, and suicide companions were the only ones allowed to work at that time. They had Sanitation workers cleaning for Ms. Ely and Ms. _____. Both in dorm _____. So when this lady got too sick to sick call and _____ them she didn't feel well. They _____ make tested her. She had all the symptoms. They told _____ was the flu. She went _____ _____. _____ they gave her an emergency _____. They knew. The whole time keeping her _____ _____. The _____ took her out because _____ _____ _____ _____ quarantine for 35 days. The whole week she was sick in the unit she lived as normal _____ _____ _____ to eat. _____ _____ was to all _____ 25. There was no movement for _____ 25, so it was less _____ 25 _____ _____. _____ _____ _____ Randomly people would say they _____ _____ _____ They would take the whole room _____ only _____ _____



One person, Veronica _____ that way. She was not positive. But they too_____ and with her commenates and stuck _____ the positives in MU. Then they would bring all the newly positive people. Now some people _____ taste. But _____ They moved Veronica to 3 different rooms, one of very sick ppl. Finally she caught it. She _____ did _____ When they moved the sick out of 25, they didn't let them take any of their stuff, they didn't clean clean their mattresses. When about 15 people from our unit _____ less than a whole _____ plus 20 _____ the others. They locked the whole confirmed down _____. No workers period. We knew _____ around 25, people would go to _____ all for headache, sore ankle, bug bite. They of course _____ help. All _____ lieue be positive. 15 ppl _____ lock _____ 15 ppl would be _____ _____ transferred. We were just stuck in here 4 inmates to cell no social distancing. No testing anyone else, leaving us to just multiply one sickness. The _____ We knew _____ 75 _____ They decided to mass test us. On July 7, _____ my _____ was tested for _____. They told us the results would be back in 5 days. One day, the warden came to the unit. We asked about our test results. He told us that they were lost and we were going to be tested again soon. Meanwhile, we haven't had any hygiene delivered. No toothpaste, toothbrush, deodorant, shampoo, soap, razors or laundry soap. They were supposed to give it out the last hour in June. But we went on full lockdown 2 days before. We were getting a sack of granola for breakfast and at lunch 8 pieces of bread with a piece of cheese, a meat, a pack of peanut butter, and a



a packet of jelly. They would put cut veggies sometimes. But it would be like half a slimy cucumber or one day they gave all of us half of a white onion. That was the day, all of 25 knew they were sick. We had half a white onion in every bag and no one knew until someone opened the bag. Not all persons in the unit could smell it. So they had to retest us on the 15th because they "lost" all of our previous test, 200 of them. By then all of us already had it. I'm sending a copy of both of my results. The results of the test they took on the 7th say "Not Detected", the one on the 15th says "Detected". I might have never known it if they had done things properly. On the 19th the officers came in and yelled out 20 people's names. We'd had all of our belonging packed in cardboard boxes for a week, four boxes in a room of 4 people barely big enough for 2. I was a nervous wreck about this. I hate change, I didn't want to move. We didn't know when, or where. It stressed me out so bad. I could barely pack my box. I didn't know where to start. Those 20 people were gone for about 2 hrs. 17 of them came back. See what happened was, they still hadn't told us anything. No results. They just started moving other people in from other units. So it was apparent that we were positive. But with those 17 that's how we knew for sure. They were our only negatives in the whole unit. They probably tested them and found out that they were now positive as well. So pretty much our entire unit contracted the virus minus maybe 15. But they kept moving them around everywhere. Eventually they got it too. We had been confined to our rooms for a month and 2 wks at this time. But after they made our unit a positive unit they told us we could come out in 2wks. In 9 days they sent the kitchen workers back to work. Didn't even wait the time. We the "Positive Unit" started going back had

④

They never tested us out to see if we would give a negative result. They just sent every Dr. up to the unit to ask if we got ___ headaches, soreness. Could we taste and smell now. Do you have a temp? OK your recovered. Well I never had a high temp and niether did 85% of the inmates who got the virus. They declared half of us recovered that day. This was after they let the kitchen workers go back.

The Warden came in one day took off his mask and said we didn't have to wear them inside ___. He was wrong. The days next ___ made us come ___ I have to have one and

They started taking down the showers curtains after they declared us recovered too. I ___ ___ as cel to ___. In all reality they weren't ___ for our ___. They went ___ the safety and the ___ ___ because they were ___ ___ ___ Stay ___ lived to 88 sqft. Already very small. Then putting up a ___ curtain too keep the sickness inside the room. OK say by some miracle someone in the room ___ ___ (is) yet. For it we couldn't leave the room for a month and a half except to ___ the bathroom and shower. We also got 15 min to use the phone and email everyday. So if your bunkie ___ ___ we had to ask if ___ room closed off. ___ ___ ventilation. It was very hot.

They were about to lose the ___ ___ so they decided to move the whole unit 25 out which is a good 850 people. They divided us up between 8N and 1N. filling those units to maximum capacity about 300 people each leaving 5 with 100 people. (There is also a unit ___ 5 they hold's about 150 people, holding only ___. We don't have enough chairs for everyone to sit in. There is no soap in the bathroom. We're in a pandemic for god sake. We got 2 rolls of toilet paper per week. We never had ___ ___ in 25. They say it's because we steal it. If things re readily accessible people won't feel ___ ___



but again we're in the middle of a pandemic and people don't want to be without. We go days without soap in the bathroom. Not only that, I've not even touched on this before but they have us 4 inmates to a cell that's 81 sq ft. Including 2 sets of bunk beds, 4 lockers and a desk. The cell size is barely within a two man cell requirement according to the (Bop's) own policy.

This February the news warned us for a whole week of a horrid freeze that would be historic. Everyday I was on the news. There was 130 car pile up. That being said. You'd think this place would have taken some precautions. It did not !!! They did not turn on the heat. The hot water turned off for 3 days and we had no water at all for 2 days. We couldn't flush the toilets, wash our hands, or drink(s) water. Those of us who didn't have any sodas or tea were suffering. We had to take ice out of the ice machine and blow dry it to make water. There are 200 of us in here. There was never enough ice and the toilets were disgusting. They were over flowing onto the floor in jail. All of this happened before the electricity grid went down. This happened when it first froze. During the first weekend. It was just pure negligence, indifference, and I don't give a shit. Many officers here are from up north. And with the windows out the house for a week. They could have wrapped the pipes and turned on the heat. When you are in charge of all of these lives. It is your job to make sure they are safe and protected.

I used to work in plumbing so I had to get my Hep B vaccine. They give it to you in 3 shots. I went for my third shot just to touch up my cycle. They had a vaccination paper waiting for me with my name, number of institution printed on it. I just had to sign on the dotted line. I did so, no screening required. Well when I asked for my medical records I found out the last one was on Jan 18 2019 but the vacc was dated 7/30/2005. Almost four years prior. That didn't seem right to me. I've sent a copy to you.



So about my mail, I have never had an incident report regarding mail. I get mail from exactly 2 people. My mom and my dad. The only things they send me are pictures of my son and the occasional _____. It has been such a chore just to get pictures of my son. They would send them to me, and it would be weeks, and finally they would get them here. I never have received a mail refusal form explaining why my mail was returned. Policy states that if my mail is refused I should receive a closed form explaining why it was returned. At first, it was because of glitter. Fine, we can remedy that. Next time, now it's because the envelopes have to be white. They never told me that, and it's not policy. Then we couldn't receive cards at all. So for Christmas we couldn't get cards from our children. So my parents sent them without cards. Again sent back. Again no refusal slip, but on the envelope to my dad it said "do not donate to inmate mail". It wasn't even open. My address is not a _____ prison or county for that matter. It's just a P.O. Box or a C.O. somewhere. This is _____ and TX. There also say _____ back for my mom not putting her full name on the envelope. Why the heck does that matter. They don't need to know her first name but they do because live (I said two people write me). I'm not an _____. They told me once they must have sent them back because there was a _____ the picture, or nudity, or alcohol or drugs. Again the pictures I sent are of my son alone. He doesn't know any inmates but me. He's 8 yrs old, and I'm pretty sure he's not sitting around naked, drinking beer and smoking a joint.

I take urinalysis every month, once a _____. I have never failed one in 3½ yrs. They came to get me on 3-21-21 around 12:45 am. They give you a 2 hrs. time slot. I peed the cup at around 1:10am. The cup registered for Fentanyl, both sides, which is crazy. I hadn't even been to pill _____ for my own pills in two weeks. There was no way. I cup shows 2 lines = in every box that is negative. The lines of _____ boxes were only on the cup and a child live at the m. (but still live) _____ do it again. This time the cup _____ 2, Fentanal, Buprofer. The last one I am smelling in _____

Way She (the guard) said =. When she said "What is Buposperone?" I said "I have no idea, send it out to the lab I know I'm not positive for any thing." It's been 6 working days since then today is the 29th. That's three seperate tests. I know I'm protected that said it was on 3 different days. This is a big deal. That would be a 100 series incident report, 47 good days taken, 45 days in the SHU, 90 days no commisary, email or phone. I was very lucky she took me on my word because she knows me. Had I been a different officer. My 100 would already be set. She did tell me that a couple of other/cups had been testing positive for different things. But just faintly like mine was. I just happened to find an article on a man named Larry Hardy. I'm sending it to you. He had a similar situation except they took him straight to the SHU. The article talks about 2000 prisoners Falsely testing positive for drugs in 2019 as a result of faulty testing equipment manufactured at Microgenics.

    When we are in the SHU we aren't allowed to buy soap or any hygiene. We are forced to use the Bob Barker products they provide. Also, when you first get there they hand you a maximum security bottle of All in one "shave cream, soap, and shampoo. Which is stictly unscented soap repackaged in a clear bottle." The company takes cost cutting a step further by replacing the soap ingrediants with dangerous preservatives not found in free world commercial soap that irritate skin and may even cause birth defects. Unbelievably, the corporation on safety warning advises people to avoid skin contact with the soap. I've sent you an article on this as well.
    While I was going through my medical records I found something interesting. Remember I said I was tested twice for Covid 19. Once on the 7-4-20 and again on 7-15-20. Well I found the lab request for both orders for covid. I sent them to you as well as my appeal to the warden. The first order was requested on 7-3-20 Labs due to Covid Outbreak request: Lab test C-Covid 19 Asymptomatic Novel sue date 7-20-20. The Second one was requested on 7-14-20 Sars-cov-2 test order   Request: Lab test C-Covid-19

Novel coronavirus    Due date 7-17-20, I would have never thought that weird. Except the fact that, they said they lost our test. Except the fact that, the first test was collected on the seventh, recieved on the eighth and reported on the 21st. Except the fact that, the second test was collected on the 15th, recieved on the 17, and reported on the 19th. Except the fact that, most of us were still negative on the first test. They wanted us to have a reason to wait there. To continue to give it to each other. There in that big unit. They didn't have room to keep picking us off and taking us out. Plus that way the numbers could go up at seperate times and they could declare us recovered at seperate times. They had us wait it out until they could call our whole unit a positive unit. I smelled lawnmower gas for 2 months after covid when I got my smell back. Now I hear we could have permanent lung damage. They did it to us on purpose.

I'm also sending my psychiatric evaluations from my first one to my most recent. For 3 1/2 yrs they see me for 10 min at a time. They have prescribed me 8 different drugs. I have seen them 7 times which is every 6 months or so.

Done this day 29th day march 2021,

Conclusion

Garrison respectfully requests this court to grant the above forementioned lawsuit speedingly as conditions have no chance of emprovement and the psycological, pysical, mental, and emotional damages have already occured and will continue till death.

Humbley,

*Leslie Garrison*

Leslie Garrison
3-29-21

# Certificate of Service

I, the undersigned, do hereby certify that I have served a copy of this forgoing instrument upon the Clerk of this Court, via properly addressed U.S. mail, with first-class postage prepaid affixed thereto, by placing into the internal mailing system as made available to inmates for legal mail, at the Federal Correctional Institution -MC Carswell. The Petitioner further requests that a copy of this her motion be forwarded to all interested parties, via CM/ECF system, as she is detained, indigent, and has no other means.

Done this 29th day of March 2021
Respectfully Submitted,

Leslie Garrison
Leslie Garrison



Leslie Garrison # 64164177.
Federal Medical Center
P.O. Box 27137
Fort Worth, Tx. 76127

Legal
Mail

Clerk of Court
District Court
501 West Tenth Street #310
Fort Worth, Tx. 76102

CERTIFIED MAIL
7020 1810 0000 3817 6811

U.S. POSTAGE PAID
FCM LG ENV
NAVAL AIR STATION JRB, TX
76127
MAR 30. 21
AMOUNT
$0.00
R2305E125671-72